Brian J. BARTLEY, Plaintiff
Below, Appellant,

v.

John G. DAVIS, Jr., State Election Com-
missioner of the State of Delaware and
Charles M. Oberly, III, Individually and
in His Capacity as Attorney General of
the State of Delaware, Department of
Elections of of Kent County, Depart-
ment of Elections of New Castle Coun-
ty, and Department of Elections of Sus-
sex County, Defendants Below, Appel-
lees.

Supreme Court of Delaware.

Submitted: Aug. 22, 1986.
Oral Decision: Aug. 22, 1986.
Written Decision: Dec. 22, 1986.

Clark W. Furlow (argued), Lassen, Smith, Katzenstein & Furlow, Wilmington, for appellant Brian J. Bartley.

Harold Schmittinger (argued) and William W. Pepper, Schmittinger & Rodriguez, P.A., Dover, for appellee John G. Davis, Jr., State Election Com'r.

Henry N. Herndon, Jr. (argued), Edward M. McNally and Lewis H. Lazarus, Morris, James, Hitchens & Williams, Wilmington, for appellee Charles M. Oberly, III, individually and in his capacity as Atty. Gen.

Before CHRISTIE, Chief Justice, McNEILLY and WALSH, Justices, constituting the qualified and available Justices of the Court, *en banc.*[*]

WALSH, Justice.

This appeal from the Court of Chancery arises out of a dispute between the two candidates for the Office of Attorney General in the Democratic Primary Election held on August 29, 1986. One of the candidates, Brian J. Bartley ("Bartley"), sought a judicial declaration that the other candidate, Charles M. Oberly, III, ("Oberly"), the incumbent Attorney General of Delaware, had not satisfied the legal requirements for registration of his candidacy because Oberly had not made timely payment of the required filing fee. Bartley also sought injunctive relief to prevent the State Election Commissioner, John G. Davis, Jr. ("Davis"), from certifying Oberly's candidacy in the primary election because of the alleged defective filing. The Chancellor, in an unreported opinion, concluded that Oberly's tender of the filing fee was not in technical compliance with the applicable statute, but had been made in good faith. He held that given the directory nature of the filing statute and the overriding public interest, Oberly's candidacy should be certified. We agree and affirm.

---

[*] Justice McNeilly retired prior to the date of the written decision but was assigned to this case pursuant to Del. Const. art. IV, § 38.

## I

██ The Chancellor's ruling included factual findings after a brief trial. Under the usual standard of appellate review, our review of those findings is limited to a search for substantial evidence supporting them. *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671 (1972). To the extent his ruling implicated issues of law we are, of course, free to examine such rulings *de novo*. *Fiduciary Trust Co. v. Fiduciary Trust Co.*, Del Supr., 445 A.2d 927, 930 (1982); *Rohner v. Niemann*, Del.Supr., 380 A.2d 549, 552 (1977).

The use of the direct primary process to select state candidates for the general election is of recent origin in Delaware. Prior to enactment of the direct primary statute, 60 Del.Laws C. 712 (1976), the selection of candidates for state offices was left to the internal machinery of political parties through the convention process.[1] The statute establishes fixed deadlines for the notification and withdrawal of candidacy. 15 *Del.C.* § 3101. However, concerning the fixing of the filing fees which accompany the formalization of candidacy, the Delaware direct primary system assumes an interplay between the state, county, and municipal executive committees of each political party on the one hand and the State Election Commissioner ("Commissioner") on the other. The mechanics of this interplay are at the nub of this litigation.

Section 3103 of Title 15 designates the manner in which filing fees are set. The setting of filing fees for each elective office is the prerogative of political parties acting through their respective executive committees at the state, county and municipal levels. The committees may fix the filing fee in any amount which does not exceed 1% of the total salary for the entire term of the office sought by the filing candidate. § 3103(b). No filing fee is required of any otherwise qualified candidate who is indigent. *Id.* Presumably, the executive committees could exempt candidates from the payment of any filing fee by fixing the amount of the filing fee at zero.[2] Once the political executive commit-

---

[1]. The only apparent exception to convention selection was the right of a defeated candidate receiving at least 35% of the convention votes to force a primary election. 57 Del.Laws C. 241 (1969).

[2]. Section 3106 provides in pertinent part:

(a) Any person desiring to be a candidate shall give notice in the following manner:

(1) Candidates for statewide office:

a. Any statewide candidate shall notify the chairman of the state committee of his respective political party, or his designee in writing, on forms prescribed by the State Election Commissioner on or before the deadline set forth in § 3101(1) of this title.

b. At the time of giving notice as required above, each candidate shall tender the required filing fee, if any, by giving a check to the State Election Commissioner, payable to the state committee of the candidate's political party, together with a copy of the notice given the party's state chairman. At such time, the Commissioner shall receipt a third copy of said notice, to be provided the candidate.

\* \* \* \* \* \*

(b) If any of the filing fees mentioned in subsection (a) of this section are not required, each candidate shall still give notice to the election agency having jurisdiction, as specified in paragraphs (1) and (2) of subsection (a) of this section, and shall receive a receipted copy of the prescribed form.

(c) Any candidate who has filed for nomination as required above may withdraw said filing by notifying the respective elections agency with whom he filed on forms prescribed by the State Election Commissioner on or before the deadline set forth in § 3101(2) of this title. The elections agency having jurisdiction shall promptly notify the same political party chairman who received the original notice of filing. The filing fee of the candidate so withdrawing shall be returned to him. In the event a candidate withdraws after the deadline set forth in § 3101(2) of this title, he shall forfeit the filing fee to the political party. In cases where no filing fee was required, any candidate withdrawing after the deadline shall submit to the respective elections agency a check payable to the Treasurer of the State in the amount of $50.

(d) Following the deadline for withdrawal of candidates, the State Election Commissioner shall promptly turn over the filing fee checks of the statewide candidates to the state chairmen of their respective political parties. At the same time, the Commissioner shall notify each county department of elections of all those statewide candidates who have qualified under this section. The county departments shall also at this time submit to the county chairman (or city chairman, if applicable) all filing fee checks

tees set the amount of the filing fees, the appropriate party chairmen must notify the Commissioner of those amounts no later than July 1 of each general election year. § 3103(c).

A person desiring to be a candidate for statewide office must give written notice of candidacy to the chairman of the state committee of his respective party before the filing deadline—12:00 noon on the last Friday of July. § 3101(1). The candidate is also required, within the filing deadline, to file a copy of his notice of candidacy with the Commissioner, together with a check in the amount of the designated filing fee. § 3106(a)(1)b. Although the filing fee check must be given to the Commissioner, it must be made payable to the state committee of the candidate's political party. *Id.* If no filing fee is required (presumably by dispensation of the political committees), the candidate must nevertheless file notice of his candidacy with the Commissioner. § 3106(b). If a candidate wishes to withdraw after filing notice of his candidacy he may do so by notifying the Commissioner before 12:00 noon of the first Friday in August, approximately one month before the primary election date. § 3106(c). If a candidate makes a timely withdrawal, the Commissioner must refund the filing fee. *Id.* Following the deadline for the withdrawal of candidates, the Commissioner must deliver all filing fees he has received to the state chairmen of the respective political parties, even if a primary election proves unnecessary because of the lack of contest in a particular race. § 3106(d).

The Democratic party's executive committee set the filing fees for statewide of-fices in the 1986 election at the statutory maximum—1% of total term salary. This action, intended to apply to the offices of the United States Representative, Attorney General, State Auditor and State Treasurer, was communicated by letter to Commissioner Davis on June 5, 1986, from Samuel L. Shipley, ("Shipley"), Democratic state chairman. The filing fee formula as applied to the office of Attorney General required payment of $2,716.[3]

Prior to the setting of the filing fees by the Democratic party's state executive committee, Oberly had been in discussions with Shipley and other members of that executive committee concerning what Oberly perceived as inadequate party financial support of his 1982 campaign for Attorney General. Oberly complained that he had received only $100 from the party in 1982 while other statewide candidates had received $1,000. Oberly argued that this slight should be redressed in his 1986 campaign. Shipley's initial response was a promise to contribute $475 to Oberly's current campaign, but Oberly pressed for further relief. At a July 16, meeting of candidates, Oberly requested a $1,000 waiver of the filing fee for all statewide candidates. Shipley agreed and indicated he would so notify the Election Commissioner.

On July 17, Shipley telephoned Davis to advise him of the waiver. Although initially agreeable, Davis later had misgivings about the change in view of the fact that the request came long after the date for the fixing of the filing fee. Davis decided to secure legal advice on the waiver question and contacted Robert Willard, a Deputy Attorney General assigned to the De-

---

from candidates of their respective political parties and shall notify the Commissioner of all persons who have qualified as candidates.

\* \* \* \* \* \*

**3.** Shipley's letter to Davis referred only to the 1% standard without stating its dollar equivalent. Subsequent discussions between Shipley and Davis fixed the filing fee at $2,902 and later at $2,716—the amount which ultimately controlled. Even that figure was an estimate. The statutory standard of "1% of total term salary" necessarily produces uncertain results simply because the total term salary of public officials whose salaries are set in annual budgetary enactments cannot be predicted at the beginning of a term. Indeed, at the time Shipley communicated the filing fee standard to Davis on June 5, 1986, the salaries of the three State officeholders, including the Attorney General, had not been established for the fiscal year beginning July 1, 1986. The budget act for that fiscal year was not approved until June 30, 1986. *See* 65 Del.Laws C. 348 (1986).

partment of Elections. Later that day, Willard orally advised Davis that he had located a 1976 Attorney General's opinion which permitted waiver of the filing fee. Willard forwarded the opinion to Davis on July 21, in a cover letter which characterized the 1976 opinion as permitting "waiver or reimbursement" of a filing fee.[4]

Despite Willard's reliance upon the 1976 Attorney General's opinion, Davis was not convinced that a waiver or refund of a filing fee could be accomplished after the filing fee had been established. He expressed his views in a July 22, 1986, letter to Shipley in which he insisted on payment of the full amount of the designated filing fees but suggested that an Attorney General's opinion did permit the State Committee to rebate a portion of the filing fees, once paid, provided all candidates were treated equally. Although the Shipley letter reflects that a copy of it was sent to Oberly, Davis conceded that, due to an administrative error, no copy of the letter was sent to Oberly.

On July 24, the day before the filing deadline, Oberly appeared in the Election Commissioner's Office to present his filing fee and notice of candidacy. He had been made aware of the 1976 opinion the previous day. Based on that awareness and on the understanding he had reached with Shipley, he tendered a filing form together with a check in the amount of $1,291, a sum apparently reflecting a credit for both the $1,000 "waiver" and a $425 contribution from the Democratic State Committee. Davis questioned the reduced filing fee but Oberly, citing the 1976 opinion, insisted that he was entitled to the full waiver. The following day, the last day for filing, Davis verified with Shipley his authority to accept the lesser amount.

On July 25, shortly before the filing deadline, Brian Bartley, a Wilmington attorney and a registered Democrat, appeared in Davis' office and filed notice of his candidacy. Although Davis advised Bartley that Oberly had paid the reduced filing fee, Bartley insisted on paying the entire filing fee of $2,716. On July 31, six days after the filing deadline, the Democratic State Committee ratified Shipley's action in reducing the filing fee for the office of Attorney General and directed repayment to any candidate for the office of Attorney General who had paid a filing fee in excess of that paid by Oberly.[5] The following day, Oberly, although insisting that he had tendered the "correct" filing fee at the time of his filing, forwarded an additional check in the amount of $1,425 to Davis, "upon the advice of my counsel."

Bartley's claim to be the only official Attorney General candidate of the Democratic Party is premised upon the argument that Oberly's filing fee was below that set by the Democratic State Committee and that the fee, once established, could not be reduced or waived after the statutorily fixed deadline of July 1. Oberly counters that the filing fee may be waived by the political party for whose benefit the fees are established and, in any event, a technical deficiency in the payment of the filing fee should not foreclose his candidacy because of his good faith effort to comply with the statute.

## II

We begin our review of Bartley's claim with an analysis of the question of law presented: Is the statutory requirement of timely payment of the designated filing fee a mandatory one in default of which the

---

**4.** As the Chancellor noted, the 1976 opinion did not directly address the question of whether a filing fee may be waived after the July 1, notification deadline in § 3103(c) since the filing fee deadline did not become effective until 1978. *See* 60 Del.Laws C. 713 (1976). Moreover, the 1976 opinion was issued in response to an inquiry asking whether a candidate would be in violation of the 1974 Campaign Financing and

Disclosure Act if he received a waiver or refund of a filing, and assumed that a waiver or refund of a filing fee was permitted.

**5.** None of the other Democratic Party candidates for state-wide office paid less than the full amount originally designated by Shipley.

attempted candidacy fails? Or, as the Chancellor concluded, is the statutory command directory in nature, in which event a technical noncompliance may be excused by a good faith effort? If the filing fee procedure imposed by 15 *Del.C.* § 3106(a)(1)b is mandatory the inquiry is at an end since a mere attempted compliance, even in good faith, is a nullity.

■ There is no universal standard or test for determining whether a statute is directory or mandatory. However, to aid in applying this elusive distinction, certain guidelines have evolved from the decisional law of this and other jurisdictions. Consistent with the overriding concern of statutory construction, the search is one for legislative intent. The question is, what did the legislature intend that the consequences of noncompliance with the statutory command be? *State ex. rel. Stabler v. Whittington*, Del.Super., 290 A.2d 659, 661 (1972). If the statute requires the performance of certain acts incident to the election process and fixes the result for noncompliance, the mandatory nature of the act is self-evident and there is no need to assess the public policy implications. *See* 25 Am. Jur.2d *Elections* § 154. Where, however, as here, the statute imposes certain filing obligations upon aspiring candidates for public office but does not declare a forfeiture of candidacy for failure to complete all formalities of the filing process no such forfeiture automatically follows. The question of whether a statutory requirement is mandatory or directory is determined on a case-by-case basis, with the primary criterion being whether the requirement is essential to preserve the interests of the parties, and especially, when an election is involved, the electorate. *Griffin v. Rogers*, Kan.Supr., 232 Kan. 168, 653 P.2d 463 (1982); *State ex. rel. Stabler v. Whittington*, 290 A.2d at 662.

■ Bartley contends that the Chancellor's ruling that the filing fee statute was directory ignores the effect of the legislature's use of the verb "shall," which generally imparts a mandatory requirement. As a general principle of statutory construction this assertion is not without decisional support. *See Delaware Citizens For Clean Air, Inc. v. Water and Air Resources Commission*, Del.Super., 303 A.2d 666, 667, *aff'd*, Del.Supr., 310 A.2d 128 (1973). However, the literal force of the verb "shall" does not control the issue of legislative intent if the statutory context and purpose suggest otherwise. *State ex. rel. Stabler v. Whittington*, 290 A.2d at 661–662; *Pearson v. Robinson*, Iowa Supr., 318 N.W.2d 188, 191 (1982); *Prince v. Hunter*, Ala.Supr., 388 So.2d 546, 548 (1980); *Wooters v. Jornlin*, D.Del., 477 F.Supp. 1140, 1146 (1979). We agree with the Chancellor that in the absence of a legislatively determined fixed result the test must be contextual.

The filing procedure contemplated by § 3106 is bifurcated to the extent that § 3106 requires both the giving of notice and the payment of a filing fee.[6] While the giving of notice is statutorily mandated, the political parties, acting through their respective governing committees, may presumably eliminate the filing fee feature for all candidates. *See supra* n. 2. The statute itself eliminates the filing fee feature for indigent candidates. § 3103(b). Even upon payment the filing fees do not become public funds. The Election Commissioner is a mere conduit of the fees, retaining them only until, at the latest, the deadline for candidate withdrawal. § 3106(c), (d).

■ In light of the role of the political parties in setting filing fees, and the entitlement to and the ultimate use to which such funds are put, it becomes clear that the filing fee aspect of the candidacy procedure serves a limited public purpose. We

---

**6.** Section 3106(a) also appears to contemplate a two step filing process. Although the sequence suggested by the language of the statute is one of initial notification to the chairman of the party's state committee followed by separate notice to the Election Commissioner by tendering "a copy of the notice given the party's state chairman," in practice the complete filing is apparently done in the Office of the Election Commissioner.

disagree, therefore, with the Chancellor's rejection of the argument that the filing fee aspect of the statute was enacted for the financial benefit of the political parties. The broad authority conferred upon the political parties to set and receive such fees clearly indicates that their purpose is primarily political. However, we share the Chancellor's conclusion that, once fixed, the filing fees assume an important public purpose—establishing an objective standard for candidacy qualification. To maintain the integrity of the elective process and insure against party manipulation in favor of certain prospective candidates, the July 1 notification.date must be considered immune from full or partial modification through subsequent waiver.

■■■■■ While we view the attempted filing fee waiver by Shipley, acting for the Democratic State Committee, as invalid, the nature and purpose of the filing fee suggest that its statutory requirement is directory only. No question has been raised concerning the adequacy of Oberly's filing as a candidate, apart from the filing fee.[7] Nor is there any suggestion that Shipley's action in reducing the fee was intended to prejudice the aspirations of any other candidate. At the time Oberly filed his notice of candidacy, no other person had filed to be the Attorney General candidate of the Democratic Party. Had Bartley not appeared the following day, in all likelihood, there would have been no primary election for that office. In that event the filing fee question would have reduced itself to an internal party matter. Thus the question becomes whether permitting a candidate to remedy a deficient filing fee by payment in full before the withdrawal date best serves the public interest. The Chancellor concluded that, under the unusual circumstances here present, the public interest in securing a free and equal primary election outweighed the need for absolute disqualification of political candidates who do not meet the deadline for

submitting the full filing fee. We agree with this value judgment.

## III

The question of whether Oberly acted in good faith is essentially a factual issue. Under the usual test of appellate review it will not be disturbed if supported by substantial evidence. While there is a clear factual basis for the Chancellor's determination that Oberly acted in good faith, the issue of good faith in this case deserves separate comment.

The assessment of a candidates's good faith effort to comply with statutory standards governing the filing process is troublesome in this case because the person whose conduct is under scrutiny is both a lawyer and the incumbent Attorney General. Equally troubling is the aggressive manner in which Oberly sought to press his views on the filing fee dispute upon a reluctant Election Commissioner. To his credit, Davis sought to adopt an independent position on the filing fee issue, but was obviously influenced, as he claims, by the fact that he was dealing with the chief law enforcement officer of the State, whose office is responsible for rendering legal advice to the Election Commissioner.

Oberly's reliance upon the 1976 opinion of a previous Attorney General to justify the payment of a reduced filing fee, while suggesting good faith, raised the spectre of conflict of interest. As previously noted, only a strained interpretation of that opinion supports the argument that the filing fee may be waived after the notification deadline imposed by § 3103(c). The July 21 letter from Oberly's subordinate Willard to Davis, which enclosed the 1976 opinion, characterized the opinion as "expressly" permitting a waiver or reimbursement. Armed with this letter, Oberly was in a position to press the legality of his cause. While we intend no reflection on Willard's

---

7. Our holding that § 3106 is directory is limited to its filing fee provision. The notice requirements of the statute implicate different policy considerations, and strict adherence to those standards would appear to be essential to an orderly primary elective process.

competence or integrity, it is obvious that he did not consider the limitations of the waiver letter in light of current statutory requirements.

 As a candidate, Oberly was entitled to pursue his waiver claim, but his concurrent status as the Attorney General relying upon advice his subordinate gave the Department of Elections created at least the appearance of a conflict of interest—a contention which Bartley vigorously advances in this appeal to counter Oberly's good faith defense. To a certain extent the potential for such conflict is inherent in a system which permits the Attorney General simultaneously to run for reelection and, through the Department of Justice, which he heads, continue to act as the legal advisor to the Department of Elections.[8] An incumbent Attorney General who seeks reelection is subject to the same legal requirements as other candidates in both the primary and general elective process. As this case illustrates, if questions arise requiring legal interpretation concerning compliance with filing standards, the conflict also arises. Nor is the conflict lessened because the issue presented might arguably be controlled by the ruling of a previous Attorney General. The interpretation of that ruling is a present responsibility which, again as illustrated here, may prove erroneous.

We are satisfied, for the reasons already expressed, that Oberly's candidacy should not be invalidated. However, the questioning of his good faith, and the unseemly spectacle of the Attorney General being accused of a violation of the election laws, could have been avoided had the actions of the Department of Elections been guided by the advice of independent counsel. If the Attorney General, as a candidate, disagrees with an interpretation of the election laws made by independent counsel and which affects his candidacy, a prompt judicial determination of the matter can be secured. Because this risk of conflict of

interest may recur we recommend to the General Assembly the advisability of exempting the State Department of Elections from the requirement of exclusive representation by the Attorney General and permitting the Department to retain separate and independent counsel.

IV

We conclude that the Chancellor's ruling that the filing fee provisions of 15 *Del.C.* § 3106 are directory only is legally correct. It follows that technical noncompliance under the circumstances of good faith here present should not result in the forfeiture of candidacy. Accordingly the decision of the Court of Chancery is AFFIRMED.

---

**8.** 29 *Del.C.* § 2504(2) requires the Department of Justice and the Attorney General to "provide legal advice" to all state agencies and departments. No state agency or department may

employ separate counsel without the joint approval of the Attorney General and the Governor. 29 *Del.C.* § 2507.