Mack D. COCHRAN, Paul J. Falkowski, Rourke A. Moore, Ernest Derrick, Marah Coleman, Charles Brittingham, Emery C. Graham, Jr., Samuel L. Guy, Susan Regis Collins, Ted Reaves, Plaintiffs,

v.

Henry SUPINSKI, Secretary Democratic City Committee, James Baker, Chairman Democratic City Committee, and Democratic City Committee, Defendants.

Civil Action No. 19143.

Court of Chancery of Delaware, New Castle County.

Submitted: Oct. 25, 2001.

Decided: Oct. 26, 2001.

**82.** Compl. ¶ 50.

**83.** *Id.* ¶¶ 67–68.

Mack D. Cochran, Paul J. Falkowski, Rourke A. Moore, Ernest Derrick, Marah Coleman, Charles Brittingham, Emery C. Graham, Jr., Samuel L. Guy, Susan Regis Collins, and Ted Reaves, Wilmington, Delaware, Pro Se Plaintiffs.

Charles J. Durante, Esquire, of Connolly Bove Lodge & Hutz, Wilmington, Delaware, Attorney for Defendants.

## OPINION

STRINE, Vice Chancellor.

In this expedited matter, members of the Democratic Party of the City of Wilmington seek a preliminary injunction in connection with the election of the committee-persons for the City Democratic Committee, scheduled to be held tomorrow. The plaintiffs desire an injunction that would require the sitting officers of the City Democratic Committee to exclude from eligibility for election as a committee-person any person who failed to file candidacy information by September 24, 2001, the deadline set forth in the Rules of the City Democratic Committee ("the Rules").

The plaintiffs have brought this action because the Chairman of the City Democratic Committee, the Honorable James M. Baker, who is also the Mayor of the City of Wilmington, extended the deadline for the filing of candidate applications to October 12, 2001. Chairman Baker did so because he had earlier failed to give public notice of the upcoming meetings which are the final step in the quadrennial selection of the 106–person Democratic City Committee. Such notice is required by another provision of the Rules. The apparent tradition is that this public notice not only informed party members of the upcoming meeting, but also informed them of the deadline by which to file candidacy information.

Chairman Baker concluded his failure to give timely public notice had injured the overall election process contemplated by the Rules, which enables City Democrats to contest for committee-person seats in separate election districts and to vote

when more than one candidate files for a seat within an election district. As of September 24, 2001, a maximum of twenty-six persons had filed, and many of them had not complied with other filing requirements. Chairman Baker therefore acted, he says, to extend the deadline to guarantee that interested candidates would have an opportunity to file following public notice and that City Democrats would as a result have a choice in selecting committee-persons at the polls.

In this opinion, I conclude that the plaintiffs' motion for a preliminary injunction should be denied. The plaintiffs have failed to take advantage of a grievance procedure open to them under the auspices of the Democratic Party of the State of Delaware, whose "State Committee" is charged with directing the operations of the State Party and its subdivisions, including the City Party. Because a potentially effective remedial process has been eschewed by the plaintiffs, this court should refrain from interfering in the internal workings of an independent political party, especially when the plaintiffs would have this court issue an order that has the practical effect of excluding City Democrats from an opportunity to participate meaningfully in the selection of the committee-persons who will serve for the next four years. Simply put, the equities do not warrant that this court assume its sparingly exercised and carefully circumscribed authority to intrude into the processes of a political party.

## I. Factual Background

The Democratic City Committee of Wilmington is one of the four major subdivisions of the Delaware State Democratic Party. From 1965 until his death on January 1, 2000, Leo T. Marshall served as the City Committee's only Chairman. Since 1966, the City Committee has operated under the same Rules.

Pursuant to the rules of the State Democratic Committee (the "State Rules"), each subdivision is empowered to adopt local rules providing for the election of committee-persons, so long as those local rules are consistent with the requirements of the State Rules. The State Rules contemplate that committee-persons will be elected to four-year terms in the year after each presidential election.

The City Committee's Rules cover the election of committee-persons. The 106 committee-persons are organized into 53 election districts within the Councilmanic districts used in connection with the election of the City Council. The Rules provide in pertinent part that:

*Call for Councilmanic District Meetings*

Section 1. (a) The chairman of the Democratic City Committee shall issue a call on the first Tuesday in September in every year next following the Presidential election for meetings in the several Councilmanic districts in the City of Wilmington for the purpose of electing members of the Democratic City Committee. The said call shall be published three times in at least one newspaper in the City of Wilmington.

(b) The Councilmanic district meetings shall be held on the last Monday in October at 8:00 P.M. in places designated in published notice.

(c) Lists of candidates for committeemen and committeewoman shall include their home address and election district they will represent within their respective Councilmanic districts and shall be filed with the secretary of the City Committee no later than 5:00 P.M. on the last Monday in September in every year next following the Presidential election.

(d) At such Councilmanic district meetings those present and who are

Democratic voters in their respective representative districts shall elect a committeeman and a committeewoman from each election district in the Councilmanic district, who shall constitute the Councilmanic District Executive Committee and who shall be members of the Democratic City Committee.

### Contest

Section 2. (a) Where there are two or more candidates for the office of election district committeeman or committeewoman, anyone [sic] of the candidates may demand a nomination election, which shall be held on the Saturday preceding the last Monday in October in every year next following the Presidential election, at which election only the properly qualified Democratic electors in the district in which contests occur shall be entitled to vote for such candidates.

\*     \*     \*     \*     \*     \*

### Provisions for Holding Elections

Section 3. The committeemen and the committeewomen shall assemble on the last Monday in October in the year next following the Presidential election at a time and place set by call, and elect a Councilmanic district chairman, vice-chairman, and secretary from among their number. The Councilmanic district chairman shall preside at all meetings of the Councilmanic District Executive Committee, and he or she shall have such other powers and perform such other duties as may be presented by the Councilmanic District Committee...

The chairman of each Councilmanic district meeting shall forthwith notify the chairman of the Democratic City Committee by letter of the results of the action taken in their respective Councilmanic district meetings.[1]

Thus, the contemplated timeline for 2001 (a year following a presidential election) appears to be as follows:

- Under § 1(a), the first of three public notices (or "calls") of the Councilmanic District meetings to occur on the last Monday of October would have begun no later than September 4.

- Under § 1(c), the candidate lists, including each candidate's home address and election district, would have to be filed by 5:00 p.m. on September 24.

- By the language of § 2(a), where there are two or more candidates for the office of election district committeeman or committeewoman, any such candidate may demand a "nomination election." This year, such election would be held on October 27. The respective Councilmanic Chairpersons are charged with organizing the elections within their districts.

- Under § 3, on the last Monday of October, a meeting would be held of committee-persons in each Councilmanic District at which the committee-persons would organize their Districts by selecting Chairpersons, a Vice–Chairperson, and a Secretary.

The Rules are hardly a model of clarity. Section 1(a) contemplates that the Chairman will give notice of meetings "for the purpose of electing members of the Democratic City Committee." Section 1(b) then indicates that the "Councilmanic district meetings" shall be held on the last Monday in October. But the meetings on the last Monday in October are not meetings at which members of the Democratic City Committee are in fact elected.

The Democratic City Committee is elected in two ways. If a candidate files and is unopposed, the candidate is elected and

---

1. Rules §§ 1(a)-(d), 2, 3.

will serve on the next City Committee. Those candidates perhaps take office at the appropriate Councilmanic District meeting on the last Monday in October, when the new District Committees elect their officers. If a seat is contested, however, the election is held on the last Saturday in October. Everyone understands that in that situation, the eligible voters are registered Democrats from within the relevant election district. Compounding the confusion, however, § 1(d) of the Rules refers to the term "such Councilmanic district meetings" in referring to the meetings at which "those present and who are Democratic voters in their respective representative districts shall elect a committeeman and committeewoman from each election district in the Councilman district, who shall constitute the Councilmanic District Executive Committee and who shall be members of the Democratic City Committee." By using the term "such Councilman district meetings," § 1(d) seems to refer back to the same meetings in § 1(a) and (b), even though the substance of § 1(d) is more logically linked to the meetings described in § 2(a). The overall effect is somewhat of a muddle.

The Rules, of course, are silent about the exact contents of the § 1(a) call. In the immediately preceding quadrennial election, in 1997, the contents of the call provided City Democrats with (1) the date of the Councilmanic District meetings on the last day of October; and (2) the filing deadline for seeking a committee-person position. That notice read as follows:

Pursuant to Section 1(a) of the Rules of the Democratic City Committee of Wilmington, Delaware, a call for meetings in the several councilmanic districts in the City of Wilmington to be held at 8:00 p.m. on October 27, 1997 in places designated by subsequent published notice is hereby issued for the purpose of electing members of the Democratic City Committee. Lists of candidates for committeemen & committeewomen shall include their home address and election district they will represent within their respective councilmanic districts and shall be filed with Henry W. Supinski, Acting Secretary of the Democratic City Committee, at 606 Market Street Mall, Wilmington, Delaware, no later than 5:00 p.m. on September 29, 1997.

LEO T. MARSHALL

Chairman

The Democratic City Committee [2]

It was published three times in the first week of September 1997, starting with the first Tuesday. A complete record of prior notices is not in the record. But a notice containing identical information was published three times in early September of 1977. As a result, available prior practice suggests that the notice under § 1(a) was used as a method of informing City Democrats that the quadrennial committee-person election process was commencing and of the deadline by which to file as a candidate.

This year, 2001, is a year after a presidential election and thus a year in which the registered Democrats in the City have the opportunity to select the City Committee. Earlier this year, the Honorable James Baker, the Mayor of Wilmington, was appointed to fill out the remainder of Chairman Marshall's term. Chairman Baker [3] succeeded the previous interim Chairman, City Councilman Norman Oliver.

---

2. Def's Ex. (presented 10/25/01).

3. I refer to Mayor Baker as Chairman Baker to make clear that this case implicates his role as Chairman of the City Democratic Committee and not his office as Mayor of the City of Wilmington.

The plaintiffs argue that Chairman Baker came to the position with an unusually sophisticated understanding of the importance of the City Committee, given his long history of involvement in the City Committee and as City Council President. Indeed, the plaintiffs contend that the September 24 filing deadline was discussed at meeting of the City Party's Rules Committee on August 27, 2001, at which Chairman Baker was present.[4] And plaintiff Mack Cochran avers that he reminded Chairman Baker in August and September of 2000 of the upcoming committee-person election and the need to get out the required notice.[5] Therefore, the plaintiffs contend that Chairman Baker was aware of the Rules and the requirement for notice.

Whether that is true or not is not critical. What is important is that Chairman Baker failed to issue the public notice required by § 1(a) of the City Rules until after the deadline set forth in § 1(c) for the filing of lists of candidates—September 24, 2001—had come and gone. This public notice was supposed to be given three times, starting with the call on the first Tuesday of September, which was September 4, 2001.

Although the City Committee is comprised of 106 committee-persons, Henry Supinski, the Committee Secretary, alleges that only twenty-six persons had indicated their interest to be a candidate as of 5:00 p.m. on September 24, 2001. Of those twenty-six, ten had failed to identify their home address and election district as required by § 1(c) of the Rules.[6]

Chairman Baker was chagrined when he learned of this situation. If the committee-person election were conducted in strict conformity with § 1(c) of the Rules and the prior failure to give notice under § 1(a) was ignored, according to defendants the following result would obtain: 1) the sixteen candidates who filed in conformity would be elected without opposition; 2) the ten candidates who filed on time but without complete information would be disqualified; and 3) the sixteen candidates who filed properly would end up with the power, per § 2.2.C.3 of the State Rules, to fill the other 90 seats on the City Committee.[7]

Chairman Baker consulted with some of the sitting Councilmanic Chairpersons of the City Committee in order to obtain their views regarding what should be done.[8] After this consultation, Chairman Baker decided to set a new deadline of October 12, 2001 for the filing of candidate applications. He then published notice of the new deadline in the Wilmington News–Journal on September 27, 28, and 29, 2001 and included the same information on the City Committee's section of the State Committee's web page. Chairman Baker left the date of the committee-person election at October 27, 2001, the same date as set forth in § 2(a) of the Rules. The

---

4. Collins Aff.; Falkowski Aff.

5. Cochran Aff.

6. The plaintiffs aver that Supinski has said different things at different times regarding how many persons filed by September 24. I need not engage that dispute to decide this motion.

7. Some of the plaintiffs contend that only one person, plaintiff Paul Falkowski, filed in strict conformity with § 1(c).

8. Plaintiff Guy asserts that Chairman Baker did not consult with him. Guy contends that he is Acting Chairman of the Fourth Councilmanic District, in the wake of the former Chairman's resignation. It may be that Chairman Baker was unsure of Guy's status. In any event, whether or not Chairman Baker consulted with all of the Councilmanic District Chairman is not material to my decision.

notice that Chairman Baker gave in the last week of September was the first public notice given regarding the 2001 committee-person election.

In his own words, Chairman Baker acted for the following reasons:

4. I believe I had no alternative but to extend the filing deadline, because a call to the election after the end of a filing deadline is meaningless. Extending the deadline was necessary to ensure public awareness of the election, to maximize participation in the process by rank-and-file Democrats, and to comply with the requirement that public notice be given of the nominating process and the election.

5. Apart from assuring the legitimacy of the process, there was a pragmatic reason for setting a new deadline. It is critical that a Democratic City Committee be elected with a full complement of members, drawn from and elected by all the City's Democrats. If an election for Democratic City Committee were held without the candidacy of all the eligible Democrats who are ready, willing and able to serve as committeemen and committeewomen, the effects on the Democratic Party would be devastating, adversely affecting the ability of the Democratic Party to elect its candidates to state and county, as well as city offices.

6. The results sought by these Plaintiffs—to exclude from the ballot over 90 percent of the candidates for the Democratic City Committee—would render the committee a mere vestige, with no mandate from the registered Democrats, no representation from most of the party's base, and above all, no ability to win elections.

7. I mistakenly and unintentionally did not post notice of the election until after the nomination deadline in the Rules had passed. The logical response was to rehabilitate the effects of the error, by posting the notice and extending the deadline so that prospective candidates for Committee positions would not be put at a disadvantage by my mistake. The illogical response would be to disenfranchise substantially all of the City's Democrats from participation in the fundamental grassroots work of the Democratic Party as committeemen and committeewomen.

8. I do not plan to run for election to a full term as City Chairman. My duties as Mayor occupy substantially all of my time, and there are other persons with the time and talent to lead the Democratic City Committee. In completing my interim term, I want to make certain that the next City Chairman, who will face enormous challenges in building the party and its necessary coalitions, will have been elected in a fair process with fullest public participation that ensures strong, legitimate leadership.[9]

On October 2, 2001, this lawsuit was initiated by ten *pro se* plaintiffs who had filed to be candidates for the City Committee by the September 24, 2001. Most of the plaintiffs did not file in strict compliance with § 1(c) of the Rules. At the very least, it is clear that plaintiffs Mack Cochran, Susan Collins, Ernest Derrick, Emery Graham, Samuel Guy, and Rourke Moore all failed to provide their home address and/or election district.

The plaintiffs' complaint seeks an injunction to prevent the City Committee from accepting the application of any persons who filed after September 24, 2001 (the "October 12 Filers"). The plaintiffs seek

---

9. Baker Aff.

to have themselves and other "September 24 Filers" be considered the only eligible candidates to be elected on October 27, 2001. Thereafter, the plaintiffs say, they and the other September 24 Filers will become committee-persons and fill the remaining 90 or more seats.[10]

The plaintiffs did not press their motion for expedited treatment until October 17, 2001. By that time, the new October 12, 2001 filing deadline had passed. The City Committee received 153 candidate applications by that deadline. According to Supinski, who is a member of the Credentials Committee, it is his intention to allow all 153 candidates to run for election within their election districts, regardless of whether they specified their election district and address in their application in strict compliance with § 1(c). Supinski will recommend that the Credentials Committee simply verify where the proposed candidates live and ensure they are registered Democrats so that these individuals may run for the appropriate seats.

## II. *The Arguments Of The Parties*

The plaintiffs' position is simple: the Rules are the Rules. Section 1(c) establishes a filing deadline of September 24, 2001. The fact that the Mayor failed to give the required public notice earlier in September cannot override the clear filing deadline plainly set forth in the Rules. Having complied with (at least the timing aspect) of § 1(c) of the Rules, the plaintiffs claim a vested right to be elected as committee-persons free from competition by October 12 Filers and a later right as sitting committee-persons to participate in selecting the other 90 or more persons to fill out the City Committee for the next four years. The plaintiffs seek to preserve

these alleged rights by obtaining a preliminary injunction preventing the City Committee from accepting nominations received after September 24, 2001.

For their part, the defendants make two primary arguments. First, they argue that this case is not justiciable and should be dismissed. Because the State Democratic Committee has recently established a grievance procedure to handle disputes arising in subdivisions of the State Party, they assert that the plaintiffs' proper avenue for redress is within the Democratic Party itself. Only a public interest of the most compelling nature would justify a judicial intrusion into the internal workings of a political party. No such interest is present here, argue the defendants, because Chairman Baker's actions ensured that City Democrats would have a fair opportunity to elect the new committee-persons at the polls despite his earlier error in failing to give the notice required by the Rules.

The defendants' second argument is based on the merits. They contend that the Rules are silent on what happens when the City Chairman fails to give the required notice pursuant to § 1(a). In view of the structure of the Rules, §§ 1(a) and 1(c) are best read together, with § 1(a) acting to guarantee that City Democrats receive several weeks' advance notice of the filing deadline. The failure of the City Chairman to give the required notice thus necessarily set in motion an election process not in compliance with the Rules. The City Chairman's decision to rectify his own error by extending the deadline was a reasonable response that was more consistent with the overall purpose of the Rules

---

**10.** There remains the possibility that enough September 24 Filers exist for a given seat that they will have to run against each other. That would appear to be an isolated exception to the overall reality, which is that success by the plaintiffs in this case will result in the uncontested election of all conforming September 24 Filers.

than was permitting a situation to transpire in which City Democrats had little to no input in electing the next City Committee. Given that the jurisprudence of this state looks with disfavor on a rigid interpretation of electoral rules resulting in the public losing its opportunity to have a choice of candidates at the polls, the defendants argue that the plaintiffs' merits showing will not support a preliminary injunction. Likewise, the defendants argue that the public interest tilts the balance of hardship heavily against the plaintiffs, because an injunction will deprive City Democrats of the chance to choose the next City Committee at the polls. Meanwhile, the denial of an injunction will merely deprive the plaintiffs of their opportunity to obtain a committee-person seat without opposition—a "right" they would likely never have had if the traditional § 1(a) notice had been timely given.

### III. *The Applicable Procedural Standard*

■ The plaintiffs have moved for a temporary restraining order. But the matter has been fully briefed by the parties and therefore I treat the motion as one for a preliminary injunction. For today's purpose, I will put the defendants' motion to dismiss to the side and deal with the pressing matter at hand—whether to issue an injunction directed at the committee-person election scheduled for tomorrow, October 27, 2001. The applicable test to measure the plaintiffs' entitlement to a preliminary injunction is well-settled. The plaintiffs must demonstrate: (i) that they have a reasonable likelihood of success on the merits of their claims; (ii) they will suffer irreparable injury in the absence of an injunction; and (iii) that the injury the plaintiffs will be relieved of if the injunc-

tion issues outweighs the injury that the defendants and others—including the public—will endure from the court's intervention.[11]

With that procedural standard in mind, I will proceed to consider the plaintiffs' application.

### IV. *The Plaintiffs' Showing Is Insufficient To Justify A Preliminary Injunction*

■ As I address this motion, I must make an obvious point: a case of this nature requires the court to proceed very cautiously. Independent political parties have played a major role in transforming the skeleton of our republican form of democracy into a functioning body politic in which the state is responsive and subordinate to the interests and will of its citizens. The American system of government derives strength from active, independent political parties that provide a vehicle for the expression of legitimate dissent and the election of new leaders— functions vital to a free society. The American tradition sharply contrasts with other forms of government, in which government-sanctioned political parties act as an arm of the state to defeat the genuine emergence of political freedom. Our tradition respects the right of citizens to associate in political parties; indeed, that right is secured by the First Amendment to the United States Constitution.

For these and other related reasons, the appropriate scope of governmental intervention in the functioning of political parties is minimal. Where even the elected organs of the federal and state governments intervene, a public interest of a compelling nature ought to be present.[12]

**11.** *Fitzgerald v. Reardon,* Del. Ch., 576 A.2d 183, 185 (1990).

**12.** *See, e.g., California Democratic Party v. Jones,* 530 U.S. 567, 582, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000).

When an unelected branch of government is called upon to pass upon a matter affecting the internal workings of a political party and no constitutional or statutory standards exist to give the court firm guidance, special caution is in order. As Chancellor Allen put it in the case of *Fitzgerald v. Reardon:*

> When a court is required to construe the statutory or common law as it applies to the internal affairs of political parties, it must act with hesitation and great care. There is a recognized public interest in the open and effective operation of the major political parties in this State. The special role and responsibilities of these parties give their internal governance a public importance even though these organizations are private in some respects. Thus, for example, a court may be justified in acting to assure that an internal party election is conducted fairly, free from manipulation that threatens the integrity of the election. *See Reardon v. Read,* De. Ch., C.A. No. 10642 (March 6, 1989) (Order). *Cf. Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944). But, concern for the public impact of political party functioning and for parties' freedom of association leads as well to a recognized tendency of courts to refrain from interference with the operation of internal methods of governance. *O'Brien v. Brown,* 409 U.S. 1, 92 S.Ct. 2718, 34 L.Ed.2d 1 (1972); *see also Cousins v. Wigoda,* 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595. 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (Rehnquist, J., concurring).[13]

In the *Fitzgerald* case, the plaintiffs claimed that they were entitled to serve as delegates to the 1990 Democratic State Convention. They complained that they had been excluded from the Convention in contravention of party rules by the New Castle County Democratic Chairman, and sought a preliminary injunction seating them as delegates. In defense of the application, the defendants argued that the plaintiffs should have to avail themselves of the internal dispute resolution processes available within the Democratic Party. Specifically, they contended that the plaintiffs should have to present their grievance to the Credentials Committee of the State Democratic Party, which had the function of determining which delegates should be seated. Chancellor Allen agreed:

> Because the identity and associational freedom of a political party are at stake in controversies about who is a legitimately elected party delegate, courts are particularly reluctant to intervene when deliberative channels within the party are available to address alleged conflicts. *See Democratic Party of the United States v. Wisconsin,* 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981) ("stating that freedom to identify the people who constitute the association"); *San Francisco County Democratic Cent. Com. v. Eu,* 826 F.2d 814, 827–29 (9th Cir.1987). In the case at bar, it seems readily apparent that this dispute concerning how the Democratic Party is to be governed—the meaning and effect of its internal rules, and thus ultimately the identity of the party itself—should be resolved in the first instance, and perhaps finally, by the party itself through its Credentials Committee and the Convention. . . .

> One need express no large generalization concerning the power or prudence of courts adjudicating rights concerning internal political party matters. It is enough for this day to express the opinion that plaintiffs have an obligation to

13.  576 A.2d 183, 185 (1990).

pursue internal mechanisms that may satisfy their claim. *See Bachur v. Democratic Nat. Party,* 836 F.2d 837 (4th Cir.1987); *Heitmanis v. Austin,* 677 F.Supp. 1347 (E.D.Mich.1988). In the end, the principle referred to above and applied by the United States Supreme Court in *O'Brien v. Brown, supra,* compels denial of the present application. In that case, the Supreme Court noted:

> Judicial intervention in this area traditionally has been approached with great caution and restraint. . . . It has been understood since our nation political parties first came into being as voluntary associations of individuals that the convention itself is the proper forum for determining intra-party disputes as to which delegates shall be seated.

409 U.S. 1, 4, 92 S.Ct. 2718, 34 L.Ed.2d 1 (1972).[14]

The defendants argue that reasoning applies to bar the relief sought by the plaintiffs here. According to an affidavit filed by the Chairman of the State Democratic Committee, Richard H. Bayard, the State Committee of the State Democratic Party adopted the following grievance procedure on September 27, 2001:

> If any member of the Democratic Party of the State of Delaware has a grievance or believes that he or she has not been fairly treated with respect to Party political business, or has a concern with the operations or organization of the State Party, and there is no provision to resolve such grievance or concern otherwise under these rules or the rules of any subdivision affected by such grievance, then that member may submit his or her grievance, in writing, to the State Chair within 10 days of the occurrence

of the event. Within 48 hours after the receipt of said notice, the Chair shall convene a Committee known as the Grievance Committee.

> The Grievance Committee shall consist of 5 members: The Parliamentarian of the city of Wilmington Democratic Committee as well as the Parliamentarians of the following subdivisions: New Castle County, Kent County, and Sussex County. The Chair of the Democratic Party of the State of Delaware shall also be a voting member of the Grievance Committee and shall be the Chair of the Committee. Upon receipt of such a complaint, the Grievance Committee shall institute an immediate investigation of said complaint.

> In the Chair's discretion, the Committee may dispense with a formal hearing and take some or all of evidence in writing. A written decision shall be tendered to the complaining person within 30 days from the State Chair's receipt of notice, *except that the State Chair may set an earlier deadline if reasonably possible and necessary to address the grievance.*[15]

Chairman Bayard averred further that the grievance policy was adopted without any consideration of using it for the present dispute. Nonetheless, he contends that the procedure was designed to address situations like this one, and to provide a fair procedure for the resolution of disputes not clearly covered by state or local Party rules. The Chairman has indicated that this grievance procedure is available for the plaintiffs to use.

At a scheduling conference in the matter on October 18, 2001, the plaintiffs were provided with a copy of the new grievance procedure. Defendants' counsel then stat-

---

**14.** *Fitzgerald,* 576 A.2d at 185–186.

**15.** Grievance Procedure, set forth in Bayard Aff. ¶ 5 (emphasis added).

ed it was his understanding that the State Party was prepared to consider a grievance by the plaintiffs on an expedited basis. This court strongly urged the plaintiffs to avail themselves of this procedure. Instead of doing so, one plaintiff submitted an affidavit indicating that he made oral attempts to bring this matter to the attention of State Party officials before October 18, 2001 and received no real attention.

I conclude that the plaintiffs' prior informal efforts do not constitute a sufficient excuse for their failure to file a formal grievance. The plaintiffs were on clear notice as of October 18 of the availability of an avenue that might satisfy their requests for relief, and of the potential consequences of not traveling that path. Yet, they refused to give that internal process a chance. One of the justifications given for that failure is an *ad hominen* attack on the defendants' counsel, who also serves the State Committee in certain capacities.

But the plaintiffs have not even given the State Party the chance to handle the matter. At oral argument, the defendants' counsel explained that he would not participate in the decisionmaking process of the grievance panel, because of his role for the defendants in this matter. "Conflicts" of this nature abound in this case, since some of the plaintiffs serve on committees of the State Party.

At oral argument, the plaintiffs also claimed that the Democratic State Committee of the State Democratic Party lacked authority to adopt the grievance procedure. Their argument is premised on the fact that a grievance procedure had been part of an omnibus proposal to amend the State Party's rules, a proposal that was ultimately not acted upon by the State Convention this year.

Yet, the plaintiffs have been unable to identify any part of the existing State Rules that prohibits the Democratic State Committee from implementing a grievance policy. Under § 6.1 of the State Rules, the "direction and general management of the State Democratic Party shall be vested in a committee to be known as the Democratic State Committee, the officers of which shall be elected by the State Convention." This authority seems broad enough to permit the State Committee to adopt a process whereby an organ of the State Party could hear grievances from the State Party's subdivisions. Given the State Committee's adoption of a grievance process, party members should be required to give it a genuine effort.

In this regard, I also reject the plaintiffs' insinuation that it was futile to file a grievance under the new policy because of timing considerations. To the extent that the Party process did not move expeditiously in response to a grievance filed by the plaintiffs *as the grievance policy expressly contemplates can be done*, that might have afforded the plaintiffs with a justification for a ruling by the court. But when the plaintiffs did not even test out the process to see if it would accommodate the need for a rapid ruling, the fault lies with them, particularly given their failure to press this case faster.

Given the strong public policy interests that justify judicial reticence in this circumstances, I conclude, per *Fitzgerald v. Reardon*, that the plaintiffs' motion for a preliminary injunction should be denied because the plaintiffs have failed to take advantage of internal party dispute resolution procedures.

That reasoning alone would suffice to justify the outcome I reach today. A brief discussion of the merits of the case, however, will show why *Fitzgerald* articulated a sound rule of law.

Any consideration of the plaintiffs' claim for relief must start with the acknowledge-

ment of a critical fact: the election of committee-persons to the City Committee in 2001 will not occur in strict conformity with the Rules, irrespective of whether this court issues an injunction. Because Chairman Baker did not give the required notice on time,[16] the election will necessarily involve a deviation from the process articulated by the Rules.

The key question thus becomes what to do about that reality. As the plaintiffs would have it, the answer is quite simple: nothing. The violation of the notice requirement should be ignored, and the other aspects of the Rules should be followed to the letter, regardless of whether those other aspects might have been crafted to work in tandem with the notice requirement. At most, the plaintiffs are willing to concede that perhaps the Rules themselves could be amended to deal with the failure to give required notice, but argue that Chairman Baker has no power to rectify his error as the leader of the City Committee by providing additional filing time. At the same time, however, the plaintiffs urge that the plain language of § 1(c) of the Rules requiring filers to identify their address and election district is a non-critical requirement that may be waived by the City Committee after the fact, thus excusing many of the plaintiffs from their own non-compliance with that provision.[17]

Simply by examining the plaintiffs' own arguments, one can see that the implementation of political party rules is not a scientific exercise, but a practical one. In this manner, it is no different from statutes, agency regulations, and court rules—all of which are often given life by sensible interpretations that do not necessarily involve a hyper-literal approach, particularly when such an approach would generate an illogical result.[18] What *Fitzgerald v. Reardon* says is that the political party itself should have the opportunity to breathe life into its own rules in the first instance, to fill interstices, and to make sense of situations in which it is impossible that an integrated set of rules can be given entire, literal effect.

In this case, the plaintiffs demand that this court step into the breach seems quite weak. The "right" that the plaintiffs claim is one that does not exist under any scenario in which the City Rules have been complied with in full. The "right" the plaintiffs claim is to be elected unopposed because they filed in compliance with the time deadlines of § 1(c) in a year in which the City Chairman failed to give the prior public notice required by § 1(a).

Some of the plaintiffs are candid in viewing this odd situation as an opportunity for what they genuinely seem to believe is needed reform. The plaintiffs claim that they have been locked out of the City Committee power structure for years.[19] Their hope is to secure election to the Committee, and the power to select the majority of the committee-persons for

---

16. I reject plaintiff Guy's argument that the § 1(a) notice could be given as late as the last Saturday in October. The purpose of giving a call in the first week of September with public notice on three occasions clearly seems intended to provide City Democrats with ample advance notice of the start of the quadrennial committee-person election process.

17. At oral argument, the plaintiffs backtracked somewhat on this position, which had been articulated in their papers.

18. *See, e.g., State v. Cooper,* Del.Supr., 575 A.2d 1074, 1076 (1990) (Literal interpretations of statutory language which yield illogical or absurd results should be avoided in favor of interpretations consistent with the intent of the legislature); *see also Daniels v. State,* Del.Supr. 538 A.2d 1104, 1109–10 (1988).

19. *See, e.g.,* Falkowski Aff.

themselves. Four years hence, they pledge to open up the process to all comers and to encourage competitive elections. But for the first years of the new era, the City Committee will consist of the those persons favored by the September 24 Filers.

It may well be that the City Committee has not been as open as it should have been over the years, and that the plaintiffs are fully justified in holding that view.[20] But the plaintiffs' argument that the City Chairman's failure to give the required notice cannot be a justification for the modification of the September 24 filing date is at best arguable, and at worst, untenable and tending towards an inequitable result.

■ Certainly a reasonable and impartial decisionmaker could interpret § 1(c) as existing within a larger temporal structure established by § 1(a) and § 2(a).[21] The notice required by § 1(a) could be viewed quite sensibly as providing *all City Democrats* with notice of the commencement of the quadrennial election process—thereby reminding those City Democrats interested in serving as committee persons to inquire about the filing deadline. Indeed, by design, the drafters of § 1(a) might have contemplated that the § 1(a) notice would, of course, include information regarding the nomination deadline. By apparent tradition, this is in fact how § 1(a) has been implemented. In this vein, it would therefore be logical to conclude that the notice required by § 1(a) precedes the filing deadline in § 1(c) by several weeks for a sound and obvious reason: the notice was expected to provide City Democrats with a reminder that the filing deadline was coming soon. Public notice requirements are more than mere formalities. They reflect a judgment about human nature, and the fact that humans have busy lives. Reminders are useful and important devices, which are given in advance of important filing deadlines in many contexts.[22]

It is not an untenable conclusion that the § 1(a) notice provision, as was suggested by plaintiffs in oral argument, exists solely to signify notice of the meeting scheduled for the first Monday in October. But, given the ambiguity of the Rules and the past practices of the party, I simply note that a disinterested and reasonable mind might find that it makes more sense to construe § 1(a) as a "generalized trigger" signifying the beginning of the quadrennial election season and the various deadlines it entails.

In the circumstances facing the City Committee this autumn, there is no possibility of implementing the Rules to the letter. A choice must be made about the alternative that will best comport with the overall spirit of the Rules, and most faithfully advance their core purpose. The plaintiffs' option is one that generally places a heavy emphasis on literal compliance with the Rules (except in the case of the plaintiffs who failed to identify their

**20.** The fact that several of the plaintiffs are sitting committee-persons tends to contradict to some extent their argument that the City Committee is a closed structure, which is not open to outsiders.

**21.** In the context of statutory construction, it is a tenet that "statutes are passed by the General Assembly as a whole and not in parts... [and] each part of the statute must be read in context to produce a harmonious

whole," *Daniels,* 538 A.2d at 1109–10; *see also Richardson v. Wile,* Del.Supr., 535 A.2d 1346, 1350 (1988). The same theory applies here.

**22.** As a member of a profession, I take my duties to that profession seriously, but take judicial notice and am appreciative of the notices I receive that remind me of important deadlines for maintaining my status.

addresses and election districts, who plaintiffs say should be excused by the City Committee for this failure and permitted to be elected). The plaintiffs' position would remind City Democrats of the importance of the Rules and teach them a valuable lesson about the negative consequences that might be suffered if party members fail to master the Rules in detail.

By contrast, the approach taken by Chairman Baker adopts the view that the most important function of the Rules relating to City Committee elections is to provide City Democrats with a fair opportunity to seek election to the City Committee and to vote in competitive elections for contested seats on the Committee. The Chairman viewed his own failure to give City Democrats proper notice of the filing deadline as having caused a situation in which this most important function of the Rules had been negated. He therefore made a decision to remedy his own error by giving more leeway in the filing process, to make up for the lack of prior notice which was supposed to have preceded the filing deadline. This decision seems to me to be one that a rational and well-motivated interpreter of the Rules could make in a situation in which literal compliance with all the Rules was, by definition, impossible.

The plaintiffs, of course, see the Chairman's decision as a cynical one, designed to address a personal problem he and many other sitting committee-persons have: they did not file by September 24. The plaintiffs insinuate that Chairman Baker acted to benefit himself and other powerful members of the City Committee who blew the filing deadline and who face potential ouster at the hands of the September 24 Filers. But the fact that the Chairman may have personal interests at stake did not obviate his duty to act in the best interests of the City Party and City Democrats. By his action, Chairman Baker did not guarantee his own re-election or the re-election of *any* committee-person. The plaintiffs were free to file a full slate of candidates by October 12 to contest all 106 seats on the City Committee. The Chairman's action merely ensured that there was an opportunity for interested candidates who did not receive the required prior notice to file. Through his action, some 153 candidates are now in the running, thus affording City Democrats with the opportunity to cast votes in competitive elections for a number of seats.

It is unclear to me why the judiciary possesses any particular advantage over the internal processes of the political-party process in deciding how the City Committee election should proceed in the wake of the Chairman's misstep. The competing policy values at stake would seem to be ones best considered by those with the most legitimacy to act on the matter: the grievance committee created by duly elected officers of the State Democratic Committee. And the normal workings of party democracy will enable the plaintiffs to use any dissatisfaction with the Chairman's decision about this matter as a platform to elect their own favored candidates to committee positions—both tomorrow and four years from now.

Prior judicial precedent in this state's courts suggests that a countervailingly powerful equity must exist to cause the judiciary to issue an order that would deprive the electorate of a choice at the ballot box.[23] The court respects that the plaintiffs harbor sincere beliefs that the

23. Several of the pertinent cases were cited in *Mirzakhalili v. Chagnon*, Del. Ch., 2000 WL 1724326, at *15 n. 59, Strine, V.C. (Nov. 9, 2000, post-script Nov. 28, 2000). In that case, this court held that when the Delaware Association of Professional Engineers had misinformed members of the date to file petitions for election, the members who filed after

relief they seek is in the larger interest of the City Party. Nonetheless, they seek judicial intervention to secure for themselves the power to hand-pick the majority of the next City Committee, to the exclusion of the thousands of other City Democrats. The plaintiffs' argument has somewhat of a "gotcha" quality, and has no doubt served to embarrass Chairman Baker and other members of the City Committee who failed to file by September 24. But it is thin gruel to sustain an injunction that would disenfranchise City Democrats in a situation where the lack of notice required by § 1(a) might have caused the dearth of filings on September 24, and where the plaintiffs have failed to seek relief within the party structure. The harm that such an injunction would cause to the legitimate expectations of thousands of City Democrats far outweighs any harm the plaintiffs will suffer if they must fight for election at the polls.

## V. Conclusion

For all these reasons, the plaintiffs' motion for a preliminary injunction is DENIED. IT IS SO ORDERED.

the deadline in the Association's bylaws but before the deadline announced by the Association were entitled to run for office. The most important case in this area is, of course, *Bartley v. Davis*, Del.Supr., 519 A.2d 662 (1986). In that case, the Supreme Court affirmed this Court's decision to permit candidacy of the incumbent Attorney General who failed to timely pay his filing fee by interpreting that requirement as "directory" rather than "mandatory." A contrary decision would have resulted in an uncontested Democratic primary in which the party's members would not have had the opportunity to select the sitting Attorney General to be their candidate in the general election. The Court held that the Chancellor's conclusion that the "public interest in securing a free and equal primary election outweighed the need for absolute disqualification of candidates who do not meet the deadline for submitting the full filing fee." *Id.* at 668.

Our courts' solicitude towards the rights of the electorate has been recognized in the corporate law area in cases such as *Rainbow Navigation v. Yonge*, Del. Ch., C.A. No. 9432, 1989 WL 40805, mem. op., 1989 Del. Ch. LEXIS 41, Allen, C. (Apr. 24, 1989) (holding that ambiguous corporate instruments should be interpreted in favor of the interpretation that enfranchises the stockholders). This solicitude towards the rights of voters in corporate associations logically extends to the members of unincorporated associations, such as political parties.