STATE OF DELAWARE, ex rel. LeRoy M. Mitchell, Nelson W. Meredith, Raymond E. Ringler, Robert D. S. Mustard, William F. Wilgus, Jr., and George B. Atkins, v. DANIEL F. WOLCOTT and JAMES B. CAREY, Associate Judges of the Superior Court of the State of Delaware at Large and for Sussex County respectively constituting the Board of Canvass in and for Sussex County, Delaware.

(*September* 25, 1951.)

SOUTHERLAND, Chief Justice, SEITZ, Chancellor, and RICH-ARDS, President Judge, sitting.

*Daniel J. Layton, Jr.,* for relators.

*Robert W. Tunnell* (of Tunnell and Tunnell) for intervenors.

Supreme Court, No. 1, February Session, 1951.

SOUTHERLAND, C. J., delivering the opinion of the Court:

This is an original petition for a writ of *mandamus* to the Superior Court of Sussex County, constituting the Board of Can-

vass. Relators seek an order commanding it to reconvene and ascertain the state of the election held in Sussex County on November 7, 1950; and, in so doing, to reject all the votes cast in one of the election districts in the County for certain candidates for office.

Several questions are raised, but the only one we need consider is this:

May the Superior Court, sitting as a Board of Canvass to ascertain the state of the election, take cognizance of a charge that the election officers unlawfully held open the polls for a period of time beyond the legal closing hour of the election, and received and counted ballots tendered during that period?

The essential facts are these:

On November 7, 1950, the day of the general election, the polling place of the Second Election District of the Third Representative District of Sussex County, was opened, in accordance with law, between seven and seven-thirty o'clock in the morning and remained open during the day for the reception of ballots. Upon the approach of the time fixed by law for closing the election (six o'clock), a substantial number of electors were standing in line outside the polling place, awaiting an opportunity to enter and cast their ballots. It was apparent that if the election should be closed at six o'clock many electors would be unable to vote. An understanding was reached between the Democratic County Chairman and the Republican District Committeeman that all persons standing in line at six o'clock should be permitted to vote, and this understanding was made known to the waiting electors and others. One of those present protested this decision, both to the committeeman and to one of the Judges of Election. The objection was unavailing. The electors in line at six o'clock (or very shortly thereafter), numbering 284, were permitted to vote. Sometime after six o'clock those still in line, numbering about 250, were admitted to the polling place. The

last voter cast his ballot at 7:45 p. m., and the election was closed.

On November 9, 1950, the day fixed for the convening of the Superior Court as the Board of Canvass (hereinafter called "the Board of Canvass"), certain of the relators, who were the Republican candidates for certain county offices balloted for at the election, and who, on the face of the returns, had been defeated, presented to the Court a petition under oath alleging the more important of the facts above set forth. The petitioners asserted that the ballots of the 284 electors voting after six o'clock were illegal, and, having been intermingled with valid ballots, were no longer identifiable, and charged that the acts of the committeemen and the election officers amounted to fraud and changed the outcome of the election. The petition prayed that the Board make an order rejecting the entire vote of the election district.

The Board of Canvass declined to act upon the petition; whereupon, on December 6, 1950 the relators (together with one other unsuccessful candidate) filed the petition now before us. Subsequently the successful Democratic candidates were permitted to intervene and assume the defense of the action. The interveners filed answers and also a motion for summary judgment with supporting affidavits. Relators filed answering affidavits and also a motion to dismiss the motion for summary judgment. Relators' motion was denied, 7 *Terry* 362, 83 *A.* 2d 759, and the case is before us on interveners' motion for summary judgment.

■ That a violation of the election laws has been made out is beyond question. The statute, 1935 *Code, Sec.* 1863, directs that the election be closed at six o'clock; it was held open for an hour and three-quarters beyond that hour. Neither the agreement of the party leaders to hold the polls open, nor the fact that such a practice had in the past been customary in some election districts of the State, supplies any justification for the

action of the election officers. The crowding of approximately 250 electors into the polling place, in violation of law, 1935 *Code, Sec.* 1855, emphasizes the original error. The desire to give every citizen the opportunity to vote is natural and understandable, but it may not be allowed to override the law. At the hour of six o'clock the election should have been closed; and the agreement to hold it open, and the acts of the election officers in yielding to the agreement and accepting 284 votes cast after six o'clock, were wholly unwarranted.

As to the effect on the result of the election, however, we decide nothing. We do not reach the question, since we think that the wrong is not one remediable by a proceeding before the Board of Canvass.

Prior to the adoption of the Constitution of 1897, the election laws provided for county boards of canvass consisting of the inspectors of the hundreds in each county and the sheriff of the county. *Code* 1893, *Ch.* 18, *Sec.* 24. Their duty was to "ascertain the state of the election throughout the county, by calculating the aggregate amount of all the votes for each office that shall have been given, in all the hundreds of the county, for every person voted for for such office." *Sec.* 28. In *McCoy v. State ex rel. Allee*, 2 *Marv.* 543, 36 *A.* 81, 82, 83, the Court of Errors and Appeals held the powers of the board to be, "in general, ministerial, and not discretionary or judicial, in their character." The certificates of election, signed by the inspector and judges and delivered to the sheriff, *Secs.* 23 and 25, were held to be "the sole and exclusive evidence" to which the board of canvass might look in performing its duty. Conceding that the board must necessarily determine the 'genuineness of the certificates, the Court held further that the board had no power "to inquire into the validity of any election * * *, nor into the irregularity or misconduct attending any election * * *, nor into the legality of any vote or votes given therein, nor to throw out * * * [any] vote or votes appearing to have been given therein,

upon the face of the said certificates of election * * *." 2 *Marv.* 560, 561, 36 *A.* 82.

Clearly, the former board of canvass could not have entertained such a petition as was presented by the relators to the Board of Canvass in this case.

To what extent were the powers and duties of the boards of canvass enlarged by the Constitution of 1897?

*Article V, Section 6, of the Constitution,* referred to hereinafter as *Section 6,* in effect constitutes the Superior Court of each county a Board of Canvass, directs the delivery of the certificates of election and ballot boxes to the prothonotary, and directs the Court to "publicly ascertain the state of the election throughout the county, by calculating the aggregate amount of all the votes for each office that shall be given in all the hundreds and election districts of the county for every person voted for for such office."

The scope of this duty is that of the former board. The second and third paragraphs of *Section 6,* however, confer the following powers:

"In case the certificates of election of any hundred or election district shall not be produced, or in case the certificates produced do not agree, or in case of complaint under oath of fraud or mistake in any such certificate, or in case fraud or mistake is apparent on the face of any such certificate, the court shall have power to issue summary process against the election officers or any other persons to bring them forthwith into court with the election papers in their possession or control, and to open the ballot boxes and take therefrom any paper contained therein, and to make a recount of the ballots contained therein, and to correct any fraud or mistake in any certificate or paper relating to such election.

"The said court shall have all other the jurisdiction and powers now vested by law in the boards of canvass, and such other powers as shall be provided by law."

Relators contend that the language above quoted transformed the board of canvass from a purely ministerial body into a judicial or at least a quasi-judicial one, with power to inquire into fraud or wrongdoing in the conduct of the election affecting the result, and correct the certificates accordingly.

■■ We agree that to a limited extent the Board of Canvass now exercises quasi-judicial powers (e. g., in rejecting ballots illegal on their face), but it by no means follows that those powers extend to the hearing and determination of every act of fraud or wrongdoing in the conduct of the election. The powers of the Board are, as before, primarily directed to the existence of "fraud or mistake *in* any such certificate", e. g., questions of its genuineness, or of a defect apparent on its face, or the like;[1] and what may be called the newly-added powers are largely, if not wholly, limited to an examination of the election papers and of the contents of the ballot box.

This conclusion is impelled, we think, by several considerations.

■ First, the Superior Court is, under the Constitution, still primarily a board of canvass whose function is to count the vote. Granting that it is "the Superior Court" for the purpose of review of its action by writ of *mandamus* from this Court, *State ex rel. Walker v. Harrington*, 3 *Terry* 14, 27 *A.* 2d 67, it yet remains true that it is a body specially created and constituted for a limited purpose, to perform specified duties, largely ministerial in nature. The framers of the Constitution, in transferring to the Superior Court the powers and duties of the former boards of canvass, added certain specified powers and none others. Had it been the intent to confer upon the new Boards general power over the conduct of elections as affecting the returns, language to that effect would certainly have been included. The *McCoy* case was decided prior to the adoption of

---

[1] It is not without significance that relators' petition to the Board of Canvass fails to allege any fraud or mistake in the certificate as such.

the Constitution, and the limited powers of a board of canvass well known. The Constitutional Convention of 1897 "accepted and gave sanction to, the language of the *McCoy* case, at least, insofar as it construed the powers, duties and functions of boards of canvass, * * *." Per *Speakman, J.*, in *State ex. rel. Walker v. Harrington*, 3 *Terry* 14, 33, 27 *A.* 2d 67, 75. The rule *expressio unius* is applicable here. It must follow, we think, that there was no intention to expand the powers of the Board of Canvass beyond those clearly enumerated in the Constitution or necessarily implied, and such other powers as the General Assembly might subsequently confer under the third paragraph of *Section* 6. The act of Assembly of June 1, 1898, 21 *Del. L. Ch.* 38, *Sec.* 23, 1935 *Code, Sec.* 1866, does nothing more in effect than to reaffirm the constitutional provisions.

Relators' counsel point to the concluding phrase of the second paragraph of *Section* 6, conferring power "to correct any fraud or mistake in any certificate", as authorizing the Board to correct any fraud in the conduct of the election which may lead to an incorrect result. This language cannot thus be divorced from its context. Its scope is clearly confined to errors resulting from the examination authorized by the preceding language of the sentence, i. e., the examination of the election papers and the contents of the ballot box.

Second, the certificates of election issued by the Board of Canvass upon the completion of the count are only *prima facie* title to office, *McCoy v. State, supra,* and the fifth paragraph of *Section* 6 of *Article V of the Constitution* expressly so provides: "No act or determination of the court in the discharge of the duties imposed upon it by this section shall be conclusive in the trial of any contested election."

A defeated candidate claiming, among other things, malconduct of the election officers or the reception of illegal votes is afforded a remedy in the Superior Court as such. See 1935 *Code, Ch.* 64. If relators' contention is accepted, the issue of the

election officers' misconduct is first tried before the Board of Canvass, and the losing candidate may then re-try it before the Superior Court, the first decision not being *res judicata*. Such an anomalous result is to be shunned.

■ Third, to permit the trial before the Board of Canvass of cases of the kind here presented, involving protracted hearings, would seriously interfere with the orderly progress of the canvass and unjustifiably delay the count. If petitions charging fraud or misconduct in the election are to be entertained, an opportunity must be given to other interested parties to deny the charges and to be heard. The time-consuming nature of such a proceeding is wholly foreign to the purpose and intent of the Constitution that certificates of election may be speedily issued to candidates elected on the face of the returns, to enable them to enter upon the discharge of their official duties. The argument *ab inconvenienti* is not to be pushed too far; but it has weight in resolving the question of intent.

In support of their contention that the Board of Canvass may inquire into misconduct of election officers in holding the election, relators cite the decisions of the Supreme Court in *State ex rel. Walker v. Harrington, supra,* and *State ex rel. Wahl v. Richards,* 5 *Terry* 566, 64 *A.* 2d 400, 404. Interveners ask us to re-examine these cases so far as they uphold the jurisdiction of this Court to issue *mandamus* to the Board of Canvass. Nothing is suggested as a sufficient basis for such a re-examination, and we reaffirm the holding of this Court's jurisdiction to issue the writ to the Board. We think, however, that both decisions are distinguishable from the case at bar. In both, the evidence of the claimed illegality of the votes was ascertainable from the contents of the ballot box. In the first case the challenged votes were those of absentee soldiers and identifiable as such, see 1935 *Code, Ch.* 60, *Art.* 4; and in the second case, the illegality appeared from the presence in the ballot box of envelopes, not signed by the clerks of election, containing 101 ballots.

Relators' counsel argues that the Supreme Court in the *Harrington* case held it to be the duty of the Board of Canvass to determine the constitutionality of the *"Soldiers Vote Act"*, a duty that was necessarily judicial in its nature; and that if the powers of the Board include the power to determine a constitutional question, they must surely include the power to pass on the questions involved here. Apart from the fact that this argument ignores the limiting language of *Section 6*, we disagree with its major premise, i. e., that the Supreme Court has held it to be the duty of the Board to decide a constitutional point. Rejecting the argument that the Supreme Court should in a *mandamus* proceeding directed to an administrative officer refuse to pass upon the constitutionality of a statute, Judge Speakman said: "But after all, the question before us is not whether it was or was not the duty of the respondents to pass upon the constitutionality of the statute in question, the question is whether or not it is our duty to do so." 3 *Terry* 37, 27 *A.* 2d 77.

From the authorities cited by the Court, it appears that the substance of the holding is that it is no defense to a petition for *mandamus* to compel an administrative board to act in accordance with law to urge that the ascertainment of the law involves a constitutional question which the board chose not to determine for itself. This is only to say that the power of the Court to issue the writ does not depend upon any supposed duty of an administrative officer to resolve a question of constitutional law, but upon its power to compel the officer to act in accordance with law.

As for the comment of the Chancellor in the *Richards* case, *supra*, to the effect that the decision in the *Harrington* case was that "the Superior Court should have rejected [the soldiers'] vote," we doubt whether it was intended as an interpretation of the prior opinion on the point we are discussing.

Accordingly, we think that the Supreme Court did not, in the *Harrington* case, hold it to be the duty of the Board of Canvass to decide a constitutional question.

It should be further observed that the *Harrington* case does not hold that *mandamus* will issue as of course to decide all legal questions that may confront the Board of Canvass in the performance of its duties. *Mandamus* is a discretionary remedy, *State ex rel. Miller v. Loft, Inc.*, 4 *W. W. Harr.* 538, 156 *A.* 170, and its use to review the rulings of the Board might conceivably be inappropriate in certain cases.

The question before us is whether the Board of Canvass has power to enter upon an inquiry into misconduct of the election officers of the kind here complained of. For the reasons above given, we hold that it has no such power, and is therefore under no legal duty to act upon a petition alleging such misconduct.

From this holding it necessarily follows that the writ of *mandamus* cannot issue.

Interveners' motion for summary judgment must be granted, and the petition dismissed.