# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| REBECCA YOUNG, ELIZABETH H. YOUNG and JAMES L. YOUNG | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 10847-VCL |
| RED CLAY CONSOLIDATED SCHOOL DISTRICT and BOARD OF ELECTIONS FOR NEW CASTLE COUNTY | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: July 10, 2015
Date Decided: October 2, 2015

Richard H. Morse, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF DELAWARE, Wilmington, Delaware; *Counsel for Plaintiffs Rebecca Young, Elizabeth H. Young, and James L. Young.*

Barry M. Willoughby, William W. Bowser, Michael P. Stafford, Margaret M. DiBianca, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; *Counsel for Defendant Red Clay Consolidated School District.*

Meredith S. Tweedie, Ann Woolfold, Scott W. Perkins, STATE OF DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware; *Counsel for Defendant Board of Elections for New Castle County.*

**LASTER, Vice Chancellor.**

On February 24, 2015, residents of the Red Clay Consolidated School District ("Red Clay") approved a referendum to increase the school-related property taxes paid by owners of non-exempt real estate located in the district. Despite complaints that Red Clay personnel violated the election laws, the Board of Elections for New Castle County (the "Board of Elections") certified the results. The Board of Elections determined that it did not have authority to investigate or make determinations regarding the alleged violations.

The plaintiffs are residents of Red Clay who had difficulty accessing the polls. They have petitioned for a writ of certiorari pursuant to which this court would review the Board of Elections' certification of the results, determine whether the Board of Elections considered the alleged violations of the election laws, and vacate the Board's determination to the extent the Board failed to consider the alleged violations. They separately seek relief against Red Clay, contending that because Red Clay personnel violated the election laws, an injunction should issue barring implementation of the tax increase. This decision does not address the plaintiffs' claims against Red Clay, which will be the subject of a separate opinion.

The Board of Elections moved to dismiss the petition for writ of certiorari for failing to state a claim on which relief can be granted. Issuing a writ of certiorari is a matter of discretion, and the power to issue the writ ordinarily lies with the Superior Court. This decision does not address the difficult issue of whether, on the facts of this case, this court would have jurisdiction to issue a writ under the cleanup doctrine. Rather, this decision holds that the petition fails as a matter of law, because under longstanding Delaware Supreme Court authority, the statutory regime at the time of the referendum did

1

not permit the Board of Elections to consider the types of election violations alleged in the Complaint when certifying the results of the vote.

## I.     FACTUAL BACKGROUND

The facts for purposes of the motion to dismiss are drawn from the Verified Supplemental and Amended Complaint and Petition for Writ of Certiorari (the "Complaint") and the documents it incorporated by reference. At this stage of the case, the well-pled allegations of the Complaint are assumed to be true, and the plaintiffs receive the benefit of all reasonable inferences.

### A.    The Red Clay Referendum

The Board of Education of Red Clay (the "Red Clay Board") called a special election to obtain authority to raise the tax rate on real property in the district by a total of 35 cents per $100 of assessed value (the "Special Election"). The Special Election took place on February 24, 2015.

Obtaining approval for the tax increase was important to Red Clay. To enhance the likelihood that the tax increase would be approved, Red Clay engaged in get-out-the-vote efforts. Among other things:

- On February 18, 2015, Red Clay's superintendent, Mervin B. Daugherty sent a letter to families with children living in the Red Clay school district urging them to vote in favor of the tax increase.

- On the day of the Special Election, Superintendent Daugherty used Red Clay's School Messenger notification service to send a reminder to families of children attending Red Clay schools to vote in favor of the tax increase.

- At least some principals of schools in Red Clay used their automated phone systems to make appeals to families to vote in favor of the tax increase.

2

- At McKean High School, administrators called students who were eighteen or older out of class and took them to the polling location to vote.

- At Alexis I. du Pont High School, school officials approached students who looked old enough to vote, asked if they were eighteen or older, and encouraged them to vote if they were old enough.

- To draw parents and guardians to the schools where voting was taking place, Red Clay scheduled family friendly events at its schools, including family fun nights, family bingo nights, activity nights, pizza parties, carnivals, dances, faculty basketball games, and a free dinner for parents and students at Heritage Middle School.

- At Austin D. Baltz Elementary School, signs encouraged parents to vote in favor of the referendum. Baltz also held a pajama dance party with pizza. Baltz personnel gave parents of students who voted a check-off card that had three boxes labeled, respectively, "I ate," "I voted," and "I danced." Once the "I voted" box was checked off, the holder was entitled to pizza, popcorn, and sodas.

- At A.I. DuPont Middle School, parents stationed at desks by the entrance told prospective voters that if they did not vote in favor of the tax increase, students would not have after-school activities.

The Complaint alleges that Red Clay's actions made it difficult or impossible for people with disabilities or reduced mobility to vote in the Special Election. Plaintiff Rebecca Young is a resident of Red Clay. She tried to bring her elderly parents, plaintiffs Elizabeth H. Young and James L. Young, to one of the schools to vote. Rebecca's parents have disabilities that limit their mobility, but she could not park in the spots at the school reserved for handicapped persons, because empty school buses were blocking the spaces. Rebecca and her parents wanted to vote against the tax increase. Ultimately, Rebecca and her parents did not vote because she was not able to park close enough for her parents to access the polling place, and she did not feel comfortable leaving her parents unattended in her vehicle while she voted. Other voters encountered similar access issues. *See id.*

3

**B.    The Certification Of The Results**

On March 10, 2015, the Board of Elections met to consider whether to certify the results of the Special Election. The members of the Board of Elections who attended the meeting were Robert L. Brady, Jr., Marilyn P. Whittington, Noel H. Kuhrt, Paul F. Lanouette, Bette Ann Pase, John N. Pasquale, Jr., James A. Sterling, III, Lawrence A. Thurrell, and Sharon A. Williams-Mayo. Brady served as President and presided over the meeting.

State Election Commissioner Elaine Manlove attended the meeting. So did Anthony J. Albence, the Director of the Department of Elections, and Howard G. Sholl, Jr., the Deputy Director. In a presentation to the Board of Elections, the Department staff addressed the "electioneering" issues that occurred during the Special Election. *See* Compl. Ex. C. The presentation noted that there were "[v]ery few issues reported **on** Election Day." *Id.* at 5. It discussed two issues related to the allegations in this case:

- Marbrook—a citizen called the Department at about 5:20 p.m. to complain about the lack of parking as well as illegal parking. . . .

- Highlands—Principal removed "Vote No" signs. Barbara contacted District and explained that while the Department does not have jurisdiction on signs outside of 50 feet, that in the interest of fairness schools should permit signs if they have signs[.]

*Id.* at 5-6.

The Department of Elections' presentation contained a separate section addressing "[c]omplaints received starting Wednesday Feb. 25th." *Id.* at 7. Several related to the allegations in this case:

- Brandywine Springs—accessibility issues (no parking available) and pizza was given away to people who voted . . . .

4

- H.B. duPont—principal made a "robo call" to parents in support of referendum[.]

- A I Middle School—the election place was compromised within 50 feet of the polling place, the Family Fun Night is a violation of election laws, people at a desk near the entrance (close to the voting room) were telling people to vote "YES" or your children would not have after school activities[.]

- Baltz—there was a sign near or in the voting room that said something like "Support the Baltz Bear by voting yes". [sic] *Department comment: The sign was near the entrance to the school part of the building. The voter entrance was in the School District part of the building. The sign, however, should not have been in public view.*

- Baltz—a person outside of the voting room was giving parents who voted a piece of green paper with three boxes, one of the boxes was checked stating that they had voted and once the three boxes were checked their child/children could get pizza and/or popcorn[.]

*Id.* at 5-9.

The presentation by the Department of Elections' staff stated that the Department would send a letter to the Attorney General asking that the Department of Justice "investigate and take appropriate action regarding" four issues, including (i) the "Baltz Bear" sign at Baltz, (ii) the alleged "food for voting" at Baltz and Brandywine Springs, and (iii) the alleged electioneering at A.I. DuPont Middle School. *Id.* at 8-9. The Department of Elections recommended that the Board of Elections certify the results of Special Election, noting that the vote counts were correct. *Id.* at 10.

State Senator Karen E. Petersen made a presentation to the Board of Elections. She asked that the results *not* be certified. She described how she became concerned about the conduct of the Special Election after receiving complaints from her constituents, and she noted that she had sent a letter to the Attorney General and the State Election Commissioner asking for an investigation. She explained that after a news

article appeared about her request for an investigation, she had been inundated with emails and phone calls from Red Clay residents who wanted to complain about what happened at their polling places.

Senator Petersen identified a number of issues resembling those set forth in the Complaint. She provided the members of the Board of Elections with copies of her remarks and the letters and emails she had received. Separately, the Board of Elections acknowledged receipt of a letter from State Representative Deborah Hudson, who had expressed her own concerns about the Special Election.

Two Red Clay staff members, Ted Amman and Patti Nash, were present at the meeting. Nash stated that Red Clay addressed the purported issues that occurred prior to and the day of the Special Election.

President Brady determined the Board of Elections did not have the authority to investigate or make determinations regarding the alleged election law violations. He stated that the only authority that the Board of Elections possessed was to certify the voting counts as accurate. The Board of Elections certified the results by a vote of eight to one.

## C.    Procedural History

On March 27, 2015, the plaintiffs filed a verified complaint that included a petition for writ of certiorari directed to the Board of Elections. On April 13, the plaintiffs filed the currently operative pleading.

## II.    LEGAL ANALYSIS

6

This decision addresses the Board of Election's motion to dismiss the petition for writ of certiorari on the grounds that it fails to state a viable claim. *See* Ct. Ch. R. 12(b)(6). The plaintiffs seek a writ of certiorari to review the Board of Elections certification of the results of the Special Election. The Board of Elections has moved to dismiss, arguing that the Delaware Code did not grant the Board of Elections authority to consider legal violations when certifying the results. When considering such a motion,

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotation marks omitted).

This decision concludes that under the statutory scheme that existed at the time of the Special Election, the Board of Elections had no authority to consider legal violations when certifying the results beyond fraud that was apparent on the face of a ballot or certificate. Before explaining the basis for this conclusion, there are two threshold issues worthy of note. The first is whether the Board of Elections is the proper party to have been named in the petition. Under Delaware law as it existed at the time of the Special Election, the Department of Elections—not the Board of Elections—was charged with "canvass[ing] the vote and certify[ing] the results" of the Special Election. 14 *Del. C.* § 1083(a) (2014). Under the statutory scheme as it then existed, Delaware had three departments of elections, one for each county in the state. *Id.* at § 201. Each department

7

was defined by statute as "the board of elections and such staff as the board shall appoint under this title." *Id.* at § 101(6). The statute further provided that "[t]he department in each county, *under the direction of the board of elections*, shall administer the election laws of this State as defined in this title." *Id.* (emphasis added); *cf.* 8 *Del. C.* § 141(a) (providing that "[t]he business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors"). Thus, under the operative statutory scheme, the board of elections was a constitutive part of its respective department of elections and operated as the governing body of that department. Each board of elections was not a separate governmental entity in itself.

Admittedly the statute was not entirely clear on this point. It elsewhere defined a board of elections as "that body of individuals appointed by the Governor and confirmed by the Senate to serve as a board of elections for their respective counties and are, as such, vested with the responsibility and power to see to the administration of the election laws of this State in their respective counties as more particularly defined in this title." 15 *Del. C.* § 101(2); *see id.* at § 202 (defining composition of Board of Elections of New Castle County). One could read this provision as having established each board of elections as a separate body. A court's task, however, is to construe a statutory scheme as a whole. *Sierra Club Citizens Coal., Inc. v. Tidewater Envtl. Servs., Inc.*, 51 A.3d 463, 470 (Del. 2012). The structure of Title 15 established the boards of elections as the governing bodies of their respective departments of elections. Even the definitional passage found in Section 101(2) included the phrase "as more particularly defined in this title," suggesting the manner in which the boards of elections were expected to exercise

"the responsibility and power to see to the administration of the election laws of this State": they were to do so as the governing bodies of the county departments of elections.

Given these provisions, the appropriate defendant in this case was the Department of Elections, not the Board of Elections. It is true that the actual decision to certify the results of the Special Election was made by humans who served as members of the Board of Elections, but that is because a legal entity (here, the Department) only can act through human agents, and the Board of Elections was the institutional actor within the Department with authority to make the final decision. The Board's decision in its official capacity constituted the act of the Department. The Department, not the Board, had the statutory obligation to "canvass the vote and certify the results," which the plaintiffs contend was breached. 14 *Del. C.* § 1083(a); *see Gunn v. McKenna*, 116 A.3d 419, 426 (Del. 2015) (suggesting that proper defendant in a challenge to conduct by the election officers would be the Department of Elections).

The plaintiffs might have attempted to sue the individual members of the Board of Elections on a theory that they violated the plaintiffs' constitutional rights under color of office. *Cf. Heaney v. New Castle Cty.*, 672 A.2d 11, 15 (Del. 1995) (discussing claim under 42 U.S.C. § 1983). But if the plaintiffs had done that, then the appropriate defendants would have been the individual members themselves, not the Board of Elections as a collective.

From an analytical perspective, treating the Department of Elections as the actual defendant simplifies matters, because the statutory provisions governing elections almost invariably refer to the Department, not the Board. Had the issue been raised, I would have

9

permitted the plaintiffs to substitute the Department. *See* Ct. Ch. R. 15(c)(3). In light of the statutory focus on the Department rather than the Board, the legal analysis in this opinion refers to the Department. The outcome is the same.

A second threshold issue is one of jurisdiction. Under Article IV, Section 7 of the Delaware Constitution, the Delaware Superior Court has "original and exclusive jurisdiction among trial courts . . . to issue common law writs of *certiorari*."[1] This court therefore generally lacks jurisdiction to consider the issuance of the common law writ.[2]

This case could be a rare exception in which "the facts involved in the legal and in the equitable claims are so intertwined that it would be undesirable or impossible to sever them." *Clark v. Teevan Hldg. Co.*, 625 A.2d 869, 882 (Del. Ch. 1992). This court previously determined that it has subject matter jurisdiction over the principal claims in this action, in part because they seek equitable relief.[3] Whether the Department of

---

[1] *Maddrey v. Justice of the Peace Court 13*, 956 A.2d 1204, 1207 (Del. 2008); *see* 1 Victor B. Wooley, *Practice in Civil Actions and Proceedings in the Law Courts of the State of Delaware* §§ 894-896 (1906) (describing common law writ of certiorari as falling within authority of Superior Court).

[2] *See In re New Maurice J. Moyer Acad., Inc.,* 108 A.3d 294, 323 n.188 (Del. Ch. 2015) (noting that the defendants had raised "significant issues concerning whether the Court of Chancery has subject matter jurisdiction over" a petition for writ of certiorari); *Gladney v. City of Wilm.*, 2011 WL 6016048, at *4 (Del. Ch. Nov. 30, 2011) ("[T]he true substance of the relief [plaintiff] seeks is a writ of certiorari, which is both an adequate remedy at law and a remedy reserved to the exclusive jurisdiction of the Superior Court."); *see also In re Daniel Kloiber Dynasty Tr.*, 98 A.3d 924, 938 (Del. Ch. 2014) (explaining the General Assembly's use of the term "exclusive jurisdiction" to allocate jurisdiction among Delaware courts).

[3] *See Steele v. Stevenson,* 1990 WL 114218, at *2 (Del. Ch. July 31, 1990) ("[E]quitable jurisdiction exists to declare a referendum election void 'where some

Elections acted properly is a matter that assumed significance only as a potential defense to the primary claims. As the plaintiffs saw it, Red Clay would contend that because the Department had certified the results, there was no basis for this court to inquire into the propriety of the vote. The plaintiffs sought to address this argument preemptively by pleading in the alternative that a writ should issue to review that decision.

The interrelationship between the primary claims and the basis for the writ suggests that this might be a rare and fact-specific situation in which a court of equity could exercise jurisdiction under the clean-up doctrine. That head of equitable jurisdiction recognizes that once the Court of Chancery properly takes jurisdiction over a case, it can exercise jurisdiction "over any legal matters properly arising during the

---

positive and material requirement of the law has been disregarded or ignored.'"); *Cochran v. Supinski*, 794 A.2d 1239, 1240 (Del. Ch. 2001) (Strine, V.C.) (exercising jurisdiction to enforce preliminary injunction over City Democratic Committee to require it to exclude from an election any person who failed to file candidacy information by a given date); *Mirzakhalili v. Chagnon*, 2000 WL 1724326, at *7 n.23 (Del. Ch. Nov. 28, 2000) (Strine, V.C.) (requiring an organization created by the General Assembly that regulated the practice of engineering in Delaware to hold a special election despite possibility that the election dispute could be "considered by the Superior Court under an appropriate writ, such as certiorari, mandamus, or, if the Attorney General cooperates, *quo warranto*"); *Page v. Kopf*, 1992 WL 245968, at *8 (Del. Ch. Sept. 30, 1992) (enforcing injunction to compel the Department of Elections to accept a candidate's nomination as the Republican candidate for New Castle County Executive and place his name on the ballot); *Bartley v. Davis*, 1986 WL 8810, at *11 (Del. Ch. Aug. 14, 1986) (Allen, C.) (issuing injunction in election dispute to require Delaware Election Commissioner to place candidate on ballot because of alleged failure to comply with election laws), *aff'd*, 519 A.2d 662 (Del. 1986). The principal Delaware authority addressing government campaign speech in connection with a tax referendum—*Brennan v. Black*, 104 A.2d 777 (Del. 1954)—was an appeal from a decision by the Court of Chancery in which the plaintiff sought equitable relief after a tax had been approved. *See Cronin v. Greenhouse*, 1992 WL 403111, at *2 (Del. Ch. Dec. 26, 1992) (describing procedural history of *Brennan*), *aff'd*, 623 A.2d 1142 (Del. 1993) (ORDER).

11

course of the litigation if the assertion of such jurisdiction will further the goal of rendering full and final relief as to all aspects of the controversy." Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 2.04, at 2-85 (2012). Like the Delaware Superior Court's jurisdiction over writs of certiorari, this court's equitable jurisdiction is constitutional. Article IV, Section 10 of the Delaware Constitution confers on the people of Delaware the full benefits of "a tribunal to administer the remedies and principles of equity." *In re Arzuaga-Guevera*, 794 A.2d 579, 585 (Del. 2001); *accord DuPont v. DuPont*, 85 A.2d 724, 729 (Del. 1951).

No Delaware case has addressed whether the Court of Chancery could exercise clean-up jurisdiction to issue a common law writ of certiorari. The parties have not cited precedents from other jurisdictions that might shed light on the question, nor have they dusted off venerable treatises on equity practice and procedure. Moreover, any answer that this court might give would not be definitive. Only the Delaware Supreme Court could reconcile two competing sources of jurisdiction, each of constitutional magnitude.

The issuance of a common law writ of certiorari is discretionary. *Newell v. Hampton*, 40 A. 469, 470 (Del. 1893) (per curiam). This opinion need not reach the question of whether a court with jurisdiction ultimately would issue the common law writ, because the predicate issue in dispute on the motion to dismiss is a straightforward matter of statutory interpretation. The dispositive question is whether the Department of Elections possessed authority to consider electoral violations when canvassing the vote and ascertaining the results of the election. Answering that question is not the equivalent of deciding whether to issue the writ. It merely requires an interpretation of the statutory

scheme. If this court were to conclude that the Department had the statutory authority to consider electoral violations, then at that point the court would have several options. It could decide whether to assert jurisdiction under the clean-up doctrine and attempt to issue the writ itself. It could transfer the case to the Superior Court for the potential issuance of the writ by its sister court. *See* 10 *Del. C.* § 1902 (providing for transfer of cases between Court of Chancery and Superior Court). Or, as the Board of Elections pointed out, I could ask the Chancellor to consider making a written request to the Chief Justice to empower me to sit as a judge of the Superior Court *pro hac vice*, thereby sidestepping the jurisdictional issue. *See* Del. Const. art. IV, § 13(2) (empowering the Chief Justice of the Delaware Supreme Court, upon written request by the Chancellor or by the President Judge of the Superior Court, to designate a judicial officer "to sit in the Court of Chancery [or] the Superior Court . . . , as the case may be, and to hear and decide such causes in such Court and for such period of time as shall be designated"). By contrast, if this opinion concludes that the Department lacks the statutory authority to consider electoral violations (as it does), then the complaint fails to state a claim for relief and the matter need go no further. *Cf. Woo v. Robinson*, 484 A.2d 950, 955 n.6 (Del. 1984) (denying motion to stay and observing that because there was no basis for a writ of mandamus, it was "unnecessary . . . to decide the very troublesome question whether one member of [the Delaware Supreme Court] has the authority under Supreme Court Rule 3, even in an emergency, to grant a writ of mandamus").

There does not appear to be any jurisdictional problem with this court interpreting

the election laws, which it has done on prior occasions.[4] Handling the motion in this fashion seems particularly efficient because the statutory issue appears controlled by settled Delaware Supreme Court precedent. Moreover, effective July 1, 2015, the General Assembly made several statutory amendments that would affect materially any future analysis of similar issues. *See* 79 Del. Laws ch. 275 (2015) (codified at 15 *Del. C.* §§ 101-7710).

## A.     Precedents Addressing The Scope Of Statutory Authority To Canvass Votes

Under Delaware law as it existed at the time of the Special Election, the Department of Elections had the responsibility to "canvass the vote and certify the results." 14 *Del. C.* § 1083(a) (2014). As an agency created by statute, the Department's authority was limited to the powers granted by the statute. *Wilm. Vitamin v. Tigue*, 183 A.2d 731, 740 (Del. Super. 1962). An unbroken line of precedent dating back to 1897 makes clear that absent explicit statutory authority to do more, a governmental body charged with canvassing the vote and certifying the results fulfills an administrative and ministerial role that does not include considering electoral law violations.

### a.     *McCoy*

---

[4] *See Page*, 1992 WL 245968, at *3 (interpreting 15 *Del. C.* § 3303 regulating timing of certificates); *Bartley*, 1986 WL 8810, at *7-8 (interpreting 15 *Del. C.* § 3103, governing filing fees, and 15 *Del. C.* § 3106, regulating candidate filing for primary elections); *cf. Cochran*, 794 A.2d at 1247-50 (interpreting City Democratic Committee's rules in determining whether to issue an injunction); *Mirzakhalili*, 2000 WL 1724326, at *9-10 (interpreting 15 *Del. C.* § 3303 and bylaws of an organization created by the General Assembly that regulates the practice of engineering in Delaware).

14

In 1897, Delaware's highest court—then the Court of Errors and Appeals[5]—first considered the extent to which a body empowered to canvass votes, ascertain the state of the election, and certify the results could consider broader issues of election law. *See McCoy v. State*, 36 A. 81 (Del. 1897). The statutory scheme as it then existed established a board of canvass consisting of the sheriff from the county where the election took place and the inspectors for each hundred within the county, all of whom were designated as "judge[s] of the general election." *Del. C. 1852*, §§ 11, 24. The statute provided that on the Thursday after the election, the inspectors were to deliver to the board of canvass the "certificate[s] of election" from the voting districts in the county. *Id.* at §§ 23-24. At that point, the statute provided that

> [t]he said board of canvass shall publicly . . . ascertain the state of the election throughout the county, by calculating the aggregate amount of all the votes . . . .
>
> After the state of the election shall have been ascertained . . . the board of canvass . . . shall, before any adjournment or separating of said board, make under their hands . . . certificates [of election]. . . .
>
> [The] presiding officer of the board of canvass shall, either personally or by

---

[5] The Court of Errors and Appeals was Delaware's highest court under the Delaware Constitution of 1831. Del. Const. of 1831, art. VI, § 7. It used a system of rotating three-judge panels comprised of trial court judges. Maurice A. Hartnett III, *Delaware Courts' Progression*, *in Delaware Supreme Court Golden Anniversary* 10 (Randy J. Holland & Helen L. Winslow eds., 2001). The Delaware Constitution of 1897 replaced the Court of Errors and Appeals with the Delaware Supreme Court, which originally used a "leftover judge" system. *Id.* at 13; Del. Const. art. IV, §§ 1, 11-12. At the time there were six judges who sat on the statewide courts. The five judges other than the trial judge who originally heard the case comprised the appellate panel. Hartnett, *supra*, at 13. In 1951, Delaware amended its Constitution to create the current Supreme Court with its permanent membership of justices. *Id.* at 18.

a person deputed by him for that purpose, deliver and lodge the said certificates of the election . . . within five days next ensuing the day of calculating the votes and ascertaining the state of the election as aforesaid . . . .

*Id.* at §§ 28, 29, 32. Additionally, the board of canvass had a singular enforcement power: if an inspector did not deliver the election results, the board could issue a warrant to compel his attendance and delivery of the certificate of election. *Id.* at § 27. Otherwise the statute did not authorize the board of canvass to do anything other than count votes and certify the results.

After an election allegedly rife with "bribery, violence, and lawlessness," the petitioners in *McCoy* sought a writ of certiorari, arguing that the board failed to ascertain the state of the election by taking into account whether election law violations occurred. 36 A. at 82. The high court held that the board of canvass was a ministerial body charged with counting votes:

> In discharging said duty, the powers of said board are, in general, ministerial, and not discretionary or judicial, in their character. While said board of canvass must necessarily determine that such certificates are genuine, and not fabricated, and are made and signed in the form and manner prescribed by law, yet said boards of canvass in this state are not empowered, and have no lawful authority, to inquire into the validity of any election in any hundred or election district, nor into the irregularity or misconduct attending any election therein, nor into the legality of any vote or votes given therein, nor to throw out, nor to refuse or fail to count, every vote or votes appearing to have been given therein, upon the face of the said certificates of election duly made and delivered and produced before said board, in the form and manner prescribed by law.

*Id.*

The high court recognized that the board of canvass had a limited and specific role that went beyond counting: it could look at ballots to determine whether they were "made

and signed in the form and manner prescribed by law," and as part of that review, the board could reject ballots that were "fabricated." *Id.* at 82. The court stressed that the board could not conduct any investigation beyond the face of the documents, and that the certificates of election delivered by the inspectors constituted "the sole and exclusive evidence from which [the board of canvass could] ascertain the state of the election throughout the county." *Id.*

In support of broader authority for the board of canvass, the relators cited the statutory reference to each inspector as a "*judge* of the general election." *Del. C. 1852*, § 11 (emphasis added). Notwithstanding the use of this term, the high court held that the board's powers were "in general, ministerial, and not discretionary or judicial." *McCoy*, 36 A. at 82. Consequently, even if the members of the board of canvass knew that bribery, violence, or lawlessness had occurred, the board of canvass had no authority to address it.

The *McCoy* court refused to issue a writ of certiorari to compel the board of canvass to exercise a power it did not possess. The *McCoy* decision held instead that the relators' remedy was in the courts:

> Finally, it should be remembered that the decision of the board of canvass neither gives nor defeats the actual title to the office. Its certificate of the result of the whole election merely furnishes prima facie evidence of the candidate's election. If he fails to obtain this, owing to the failure of mandamus or other proceeding, he yet has his resort to the court or appropriate tribunal which finally determines, not merely prima facie, but conclusively, his actual de jure title, wherein the legality and validity of the election and the real merits of the case can alone be investigated and decided. So that a temporary detriment only, and not an irremediable one, is really done him.

*Id.* at 87.

### 2. *Wolcott*

In 1951, Delaware's highest court—then the Delaware Supreme Court—re-affirmed the teachings of *McCoy*. *See State ex rel Mitchell v. Wolcott*, 83 A.2d 762 (Del. 1951). The electoral framework had changed in the interim. The *McCoy* case was decided in January of 1897. Later that year, the Delaware Constitution of 1897 became effective. Under Article V, Section 6, the Superior Court for the county in which the election took place replaced the board of canvass as the vote-counting and result-certifying body for general elections. *See* Del. Const. art. V, § 6. At the time of the *Wolcott* decision, the first paragraph of Article V, Section 6 stated:

> The presiding election officer of each hundred or election district, on the day next after the general election, shall deliver one of the certificates of the election, made and certified as required by law, together with the ballot box or ballot boxes, containing the ballots, and other papers required by law to be placed therein, to the Prothonotary of the Superior Court of the county, who shall at twelve o'clock noon on the second day after the election present the same to the said court, and the election officer or officers having charge of any other certificate or certificates of the election shall at the same time present the same to the said court, and the said court shall at the same time convene for the performance of the duties hereby imposed upon it; and thereupon the said court, with the aid of such of its officers and such sworn assistance as it shall appoint, shall publicly ascertain the state of the election throughout the county, by calculating the aggregate amount of all the votes for each office that shall be given in all the hundreds and election districts of the county for every person voted for such office.

Del. Const. art. V, § 6 (amended 1999). The provision further stated that "[a]fter the state of the elections shall have been ascertained as aforesaid, the said court shall make certificates thereof, under the seal of said court . . . and transmit, deliver and lodge the same as required by this Constitution or by law . . . ." *Id.* Notably, although Article V,

18

Section 6 gave the task to the Superior Court, the basic charge was the same as in *McCoy*: to "ascertain the state of the election throughout the county" and certify the result.

Article V, Section 6 did add some language not found in the statute governing the board of canvass in *McCoy*. In 1951, paragraphs two and three of Article V, Section 6 stated:

> In case the certificates of election of any hundred or election district shall not be produced, or in case the certificates produced do not agree, or in case of complaint under oath of fraud or mistake in any such certificate, or in case fraud or mistake is apparent on the face of any such certificate, the court shall have power to issue summary process against the election officers or any other persons to bring them forthwith into court with the election papers in their possession or control, and to open the ballot boxes and take therefrom any paper contained therein, and to make a recount of the ballots contained therein, and to make a recount of the ballots contained therein, and to correct any fraud or mistake in any certificate or paper relating to such election.
>
> The said court shall have all the other jurisdiction and powers now vested by law in the boards of canvass, and such other powers as shall be provided by law.

*Id.* at 765-66.

In *Wolcott*, the petition identified a clear statutory violation. By law, polling places were required to close at 6:00 p.m. Despite this prohibition, one of the judges of election allowed 284 people to vote after that hour. The Delaware Supreme Court regarded it as "beyond question" that this act violated the election laws. 83 A.2d at 764. Nevertheless, relying on *McCoy*, the Delaware Supreme Court held that the Superior Court, sitting as a board of canvass, did not have authority to consider the violation. *Id.* at 766, 768.

To distinguish *McCoy*, the relators argued that although the first paragraph of Article V, Section 6 provided the Superior Court (*qua* board of canvass) with the same

19

duties as in *McCoy*, paragraphs two and three gave the court additional powers that enabled it to consider the election law violation. *Id.* at 765-66. The relators pointed to the power "to correct any fraud or mistake in any certificate," arguing that this language gave the court the power to correct *any* fraud in the election that could lead to an incorrect vote. *Id.* at 766.

The Delaware Supreme Court agreed that Superior Court (*qua* board of canvass) had quasi-judicial powers to correct fraud in any certificate or ballot, but the Delaware Supreme Court held that correcting fraud apparent on the face of the certificate or ballot was the extent of that power. The Delaware Supreme Court held that the additional two paragraphs in Article V, Section 6 did not give the Superior Court authority to address election law violations. The *Wolcott* decision explained that the Delaware Constitution would have needed to grant the Superior Court (*qua* board of canvass) that authority explicitly, and the language of Article V, Section 6 was not specific enough. The relators had not alleged "any fraud or mistake in the certificate," and the Superior Court (*qua* board of canvass) had no "power to enter upon an inquiry into misconduct of the election officers" and was "therefore under no legal duty to act upon a petition alleging such misconduct." *Id.* at 766 n.1, 768.

Once again, as in *McCoy*, the Delaware Supreme Court pointed to a plenary action as the appropriate means for relief.

> [T]he certificates of election issued by the [Superior Court as board of canvass] upon the completion of the count are only prima facie title to office. . . . A defeated candidate claiming, among other things, malconduct of the election officers or the reception of illegal votes is afforded a remedy in the Superior Court as such. . . . If relators' contention is accepted, the

> issue of the election officers' misconduct is first tried before the [Superior Court as board of canvass], and the losing candidate may then re-try it before the Superior Court, the first decision not being *res judicata*. Such an anomalous result is to be shunned.

*Id.* at 767 (citations omitted).

### 3. *Seitz*

Finally, in *State ex rel. Tarburton v. Seitz*, 168 A.2d 110 (Del. 1961), the Delaware Supreme Court reaffirmed its rulings in *McCoy* and *Wolcott.* The petitioner in *Seitz* challenged a decision by the Superior Court (*qua* board of canvass) to certify the results of a general election because of alleged violations of 15 *Del. C.* §§ 5501-17, a statute that regulated the use of absentee ballots. The petitioner argued that the Superior Court's power as a board of canvass to review ballots and compel the production of election papers gave it the authority to investigate and rule on the use of absentee ballots. The petitioner contended that the Superior Court (*qua* board of canvass) should have subpoenaed officials from the Department of Elections and conducted a hearing regarding the use of absentee ballots. *Id.* at 113.

The Delaware Supreme Court rejected this argument, holding yet again that the Superior Court when acting as the board of canvass was a ministerial body that could exercise jurisdiction to conduct the type of hearing that the petitioner requested. The hearing would have resembled a trial, and a ministerial body did not have the power to hold a trial. The Delaware Supreme Court declined to rely on the Superior Court's authority to examine ballots and certificates for fraud as a basis to "stretch[] the jurisdiction of the Board of Canvass" to encompass a merits hearing. *Id.* at 295.

Summing up its reasoning, the Delaware Supreme Court explained that the Superior Court *qua* board of canvass was not the proper body to address the petitioner's claims: "Petitioner has mistaken his remedy. He is seeking to give the Board of Canvass power to try a contested election proceeding. Such a remedy is available under 15 *Del. C.* §§ 5941–5955, but not before the Board of Canvass." *Id.* at 294. As the Delaware Supreme Court had explained in *McCoy* and *Wolcott*, the proper forum for challenging the election was a judicial proceeding. *Id.*; *see Williams v. Sterling Oil of Okla., Inc.*, 273 A.2d 264, 265 (Del. 1971) (holding that a set of inspectors of election exceeded their power by considering evidence of voter intent when counting votes).

## B.      The Statutory Scheme For The Special Election

At the time of the Special Election, the law governing the canvassing of votes for general elections had not changed materially since *Wolcott*. The Superior Court continued to sit as the board of canvass, and that body still had to "publicly ascertain the state of the election throughout the county," "make certificates thereof," and "transmit, deliver and lodge" them with the sheriff of the county. Del. Const. art. V, § 6. The regime for school tax referenda differed.

The Superior Court only acts as the board of canvass for general elections, a term that "does not include school or municipal elections." *Abrahams v. Super. Court,* 131 A.2d 662, 667 (Del. 1957). For school tax referenda, Title 14 governs. Until 2003, it provided for the school board calling the referendum to appoint election officers who would canvass the vote. 71 Del. Laws ch. 180, § 1906, *amended by* 74 Del. Laws ch. 122 (2003). The election officers appointed by the school board were required to "meet after

22

the close [of the referendum] to ascertain the result and certify the same to the Commissioner of Elections . . . who shall, on the third day after the election, declare the result of such election . . . ." *Id.* at § 1909. The statute at the time provided that ten or more voters could petition for a recount. *Id.* at 1910.

The General Assembly amended Title 14 in 2003 to change the procedures for "canvassing and certifying public school elections." Del. S.B. 107 syn., 142nd Gen. Assem. (2003). The amendment assigned to the Department of Elections the functions previously carried out by the election officers appointed by the school board. At the time of the Special Election, Section 1083 of Title 14, titled "Counting ballots; tie vote; certification of election," stated:

> (a) The Department of Elections conducting an election in accordance with this title shall compile and announce the unofficial results as soon as possible after the close of the election. No later than 15 days following the close of a public school election, the Department of Elections conducting the election shall canvass the vote and certify the results of the election . . . .
>
> (d) Certification requirements.—
>
>> (1) In the case of an election pursuant to Chapter . . . 19 of this title, the Department of Elections that conducted the election shall present certification of the results to the superintendent of the respective school district no later than the 16 days following the day of the election. . . .
>
> (e) Within 96 hours following the certification of a public school election, 25 or more persons who voted in the aforesaid public school election may petition the Department of Elections that conducted the election for a recompilation of the results, if the difference . . . in an election conducted in accordance with Chapter 19 . . .of this title was less than 10 votes or one-half of one percent of the total vote whichever is larger. . . . The Department of Elections that conducted the elections shall: . . .
>
>> (2) Examine the absentee vote tally sheets and determine if errors were made in reporting the absentee vote. The department shall then

23

> correct any errors in the reporting of the absentee votes.
>
> (3) Count or cause to be counted all absentee ballots that were cast in the election and correct any errors in the tally that had been reported.

14 *Del. C.* § 1083 (2014), *amended by* 79 Del. Laws ch. 275 (2015).

Title 14 granted the Department of Elections the same powers, functions, and duties as the provisions considered by the Delaware Supreme Court in *McCoy*, *Wolcott*, and *Seitz*. As under the regimes considered in those decisions, Title 14 obligated the Department of Elections to certify the results of the vote, then "present [the] certification of the results to the superintendent." 14 *Del. C.* § 1083(d)(1). The boards of canvass in *McCoy* and *Wolcott* similarly were required to certify the results of the election and "deliver and lodge" the certifications with the appropriate government authority. *Del. C. 1852*, § 24; Del. Const. art. V, § 6 (amended 1999). Those functions did not include the ability to inquire into electoral misconduct. Also as in *McCoy* and *Wolcott*, Title 14 granted the Department of Elections the power to appoint an "inspector" and "judges" of the election. Both *McCoy* and *Wolcott* held that these terms did not confer judicial or quasi-judicial authority. 83 A.2d at 371, 373. Title 14 also directed the Department of Elections to "compile" the votes. 14 *Del. C.* § 1083(a). The boards of canvass at issue in *McCoy* and *Wolcott* had the same authority, which did not give them the ability to inquire into legal violations. The Department of Elections also could "correct any errors in the reporting" or "tally" of votes. 14 *Del. C.* § 1083(e)(2)-(3). So could the *Wolcott* board of canvass, but the Delaware Supreme Court held that the statutory language identified the full extent of the board's power. The ability to correct documentary errors did not amount

24

to the authority to inquire into legal violations during the conduct of the election.

Title 14 did grant the Department of Elections the power "to enforce" certain election laws, a power that was not at issue in *McCoy*, *Wolcott*, and *Seitz* . Under Title 14, the Department of Elections had the duty to take "steps necessary to maintain order within the polling place as well as enforce" a statutory prohibition on electioneering. *Id.* at 1088(b). These are executive functions that the Department had a duty to exercise during the conduct of the Special Election. *See Chabal v. Reagan*, 841 F.2d 1216, 1222 (3d Cir. 1988) (explaining that when marshals enforce federal laws, they perform executive functions); *Pottock v. Mellott*, 22 A.2d 843, 848 (Del. 1941) (contrasting tax enforcement actions from tax proceedings and finding only the latter was quasi-judicial because they "the characteristics of a judgment"). This authority did not extend to holding hearings after the fact to determine whether the law had been violated.

The Department of Elections also has various executive powers under Title 15. Those powers do not apply to this case, because they do not relate to the Department's authority to certify the results of a school tax referendum. Instead, Title 15 addresses the Department's general duties across all elections. Those duties apply in elections where the results are reviewed by the Superior Court sitting as a board of canvass, and the Delaware Supreme Court held in *Wolcott* and *Seitz* that in those settings, a plaintiff must seek a remedy for electoral misconduct in the courts. If the duties of the Department under Title 15 included investigating and ruling on electoral misconduct, then decisions like *Wolcott* and *Seitz* would have sent the petitioners to the Department of Elections for their remedy. The fact that *Wolcott* and *Seitz* held that the petitioners' remedy lay in the

25

courts shows that Title 15 as it existed at the time of those decisions and the Special Election did not give the Department authority to investigate and rule on electoral law violations.

## C.    Other Statutory Indications

Other aspects of Delaware's election laws reinforce the conclusion that the Department of Elections did not have the ability to conduct an inquiry into electoral law violations under the scheme in existence at the time of the Special Election. In contrast to the regime for school elections, if a "municipality's Board of Elections" receives a complaint about pre-election illegality or misconduct, it must meet within ten days, issue a written decision within twenty-four hours of that meeting, and then "order[] lawful action necessary to correct such legal error." 15 *Del. C.* § 7552. The statutory scheme for municipal elections includes a path for citizens to challenge a vote that the municipality's board of elections certified. 14 *Del. C.* § 1083(e).

After the events giving rise to this case the General Assembly amended Delaware's election laws effective July 1, 2015. 79 Del. Laws ch. 275 (2015) (codified at 15 *Del. C.* §§ 101-7710). Among other things, the amendments merged the three county departments of election into a single statewide department headed by a single board. 15 *Del. C.* §§ 101(2), 203. They also gave the State Election Commissioner broad investigatory and fact-finding powers, including the ability to issue subpoenas. *Id.* at § 302A. The amendments appear to have been intended, at least in part, to provide the Department of Elections with powers it did not have under the law as it existed at the time of the Special Election.

26

### III. CONCLUSION

The Board of Elections' motion to dismiss is granted. Under the statutory scheme in effect at the time of the Special Election, the Board of Elections lacked authority to investigate and rule on violations of the electoral laws.